ALABAMA LEGISLATIVE BLACK CAUCUS, et al., Plaintiffs,

v.

The State of ALABAMA, et al., Defendants.

Demetrius Newton, et al., Plaintiffs,

v.

The State of Alabama, et al., Defendants.

Case Nos. 2:12–CV–691, 2:12–CV–1081.

United States District Court, M.D. Alabama, Northern Division.

Aug. 2, 2013.

James Uriah Blacksher, U.W. Clemon, White Arnold & Dowd P.C., Wilson Edward Still, Edward Still Law Firm LLC, Birmingham, AL, for Plaintiffs.

James William Davis, State of Alabama, Jordan Dorman Walker, Jr., Balch & Bingham LLP, Misty Shawn Fairbanks Messick, Office of the Attorney General, Montgomery, AL, John Joseph Park, Jr., Strickland Brockington Lewis LLP, Atlanta, GA, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

WILLIAM H. PRYOR JR., Circuit Judge Presiding.

On April 3, 2013, 2013 WL 1397139, the State of Alabama and Beth Chapman, in her official capacity as Secretary of State of Alabama, filed a motion for a partial summary judgment against count three of the amended complaint of the Alabama Legislative Black Caucus, Bobby Singleton, the Alabama Association of Black County Officials, Fred Armstead, George Bowman, Rhondel Rhone, Albert F. Turner Jr., and Jiles Williams Jr. On April 17, 2013, the Black Caucus plaintiffs filed motions for this Court to reconsider our denial of their second motion for a partial summary judgment and for the entry of a permanent injunction. For the reasons explained in this memorandum opinion and order, we **GRANT IN PART** the motion for a partial summary judgment in favor of the State defendants as to the first claim in count three and **DISMISS** the second claim in count three for lack of subject matter jurisdiction. In the alternative, we **GRANT** a summary judgment in favor of the State defendants as to the second claim in count three. We **DENY** the Black Caucus plaintiffs' motion for reconsideration and **DENY AS MOOT** their motion for the entry of a permanent injunction.

## I. BACKGROUND

This case concerns the redistricting of the Alabama Legislature, and this order concerns claims of partisan gerrymandering and a denial of equal protection. The Black Caucus plaintiffs contend that the new districts for the election of the Alabama Legislature violate their rights under the First and Fourteenth Amendments. And the Black Caucus plaintiffs allege that one key problem with the new districts involves the malapportionment of county residents in the districts of local delegations for various counties. To understand the context of those claims, we will explain the organization of the legislature, the most recent effort of the legislature to redistrict itself, and the procedural history of this litigation.

The legislative power of Alabama is vested in the Alabama Legislature, which consists of the Senate and the House of Representatives. Ala. Const. Art. IV, § 44. Members of the Legislature are elected on the first Tuesday after the first Monday in November, and they serve for terms of four years. *Id.* § 46.

Because all members of the Legislature are elected on the same day, each new four-year session of the Legislature begins with an organizational session. *Id.* § 48.01. At this organizational session, the

only business that may be conducted is "the organization of the legislature, the election of officers, the appointment of standing committees of the senate and the house of representatives for the ensuing four years," and the certification of elections. *Id.* Each Legislature is free to adopt its own internal rules and committees for the facilitation of lawmaking. The current session of the Alabama Legislature employs standing committees to study the subject matter of legislation and make recommendations to the houses about bills, as well as a Rules Committee to determine the order of business in each house. But a bill cannot become law in Alabama until that bill has been approved by a majority of each house of the Legislature and signed by the Governor or approved again by a majority of the Legislature over the veto of the Governor. *Id.* Art. V, § 125.

Because the Constitution of Alabama limits the power of local governments, the Alabama Legislature is responsible for a significant amount of local legislation, and the current Legislature uses local delegations to facilitate the passage of this legislation. Each house has similar, but not identical, customs for local bills.

All members of the Senate are members of local delegations for the counties that they represent. The local delegation of a particular county must approve local legislation before it can move forward to a local legislation committee and again before it can be sent to the floor. The local delegations of Jefferson County, Mobile County, and Madison County each have a standing local legislative committee made up of the same members as the local delegation, and the rest of the local delegations use another local legislative committee whose members are appointed. The latter committee does not vote on the local legislation; instead, the local delegations of the counties sign the legislation out of that committee.

Although local legislation is often uncontested on the Senate floor as a matter of local courtesy, there is no Senate rule that requires deference to delegations. Any senator may oppose local legislation on the floor of the Senate. And on tax and alcohol related matters, Senate members routinely contest legislation for other localities.

All members of the House of Representatives too are members of local delegations for the counties that they represent. Each local delegation with more than five members has a corresponding standing committee in the House of Representatives to consider its local legislation, and a separate standing committee considers local legislation from all other delegations. A local delegation with more than five members must approve local legislation by a majority vote before it is sent to the House floor, but a local delegation with fewer than five members must unanimously approve the bill before it is sent to the House floor. House members are free to oppose local legislation on the floor, but local legislation is often uncontested as a matter of courtesy. Although local legislation is often uncontested in the House of Representatives, legislators can and do deviate from this practice. House Rule 23 allows any member of the House of Representatives to file a contest on a local bill as long as he or she does so in written form with the Clerk. *See* Ala. H. Rule 23. If the member of the House of Representatives wishes to contest a bill for more than one day, that member can submit one letter and inform the Clerk each day that the contest is still active. While the bill is under contest, it cannot be presented to the full House, unless four/fifths of those present and voting suspend the rules to bring the bill to the floor or the rules committee places the bill on a special order calendar. Local legislation is not enacted until it receives a majority vote in both

houses of the Alabama Legislature and is signed by the Governor.

The rules for local legislation, including the use of local delegations, are adopted in the organizational session held each quadrennium and can be modified at any time. At the end of a quadrennium, the rules and committees that protect the system of local delegation cease to exist until such time as the Legislature adopts a system of local delegation again. Although the rules for local legislation that have been adopted by each Legislature have been fairly consistent over the last twenty years, new local legislative committees have been created. The House of Representatives has created new local delegation committees when new district lines have split counties so that at least five members of the Legislature represent voters of that county. And the Senate has increased the number of standing committees.

After the census in 2010 revealed the malapportionment of the Alabama Legislature, the Legislature created a Joint Legislative Reapportionment Committee to establish guidelines for new legislative districts. The guidelines provided that, "to ensure compliance with the most recent case law in this area and to eliminate the possibility of an invidious discriminatory effect caused by population deviations in a final [ ] redistricting plan, ... individual district populations should not exceed a 2% overall range of population deviation." Guidelines Art. II, § 2(b), *available at* http://www.legislature.state.al.us/re apportionment/Guidelines.html. The Guidelines also provided that "[a] redistricting plan will not have either the purpose or the effect of diluting minority voting strength, shall not be retrogressive, and shall otherwise comply with Sections 2 and 5 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the Constitution" and that "[a]ll legislative

and congressional districts will be composed of contiguous and reasonably compact geography." *Id.* Art. IV, §§ 2, 4. After public comment, the Legislature approved new district maps, and, on May 31, 2012, Governor Robert Bentley signed into law Acts 2012–602 and 2012–603, which established the new districts.

After Governor Bentley signed the Acts, the Black Caucus plaintiffs filed a complaint against the State and Chapman, in her official capacity as the Secretary of State of Alabama. The complaint asserted three counts: violation of the guarantee of one person, one vote under the Equal Protection Clause of the Fourteenth Amendment, U.S. Const. Amend. XIV, § 2; dilution and isolation of the strength of black votes in violation of section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, the Fourteenth Amendment, U.S. Const. Amend. XIV, and the Fifteenth Amendment, U.S. Const. Amend. XV; and partisan gerrymandering in violation of the First Amendment, U.S. Const. Amend. I. The Black Caucus plaintiffs moved for partial summary judgment and preliminary and permanent injunctive relief on count one of their complaint.

The State defendants filed a motion to dismiss or, in the alternative, to stay the action until the Attorney General of Alabama, Luther Strange, obtained either administrative or judicial preclearance of the new districts under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. We granted the motion of the State defendants to stay the matter until either the Attorney General of the United States, Eric Holder, or the United States District Court for the District of Columbia decided whether to preclear the districts. After Attorney General Holder pre-cleared the new districts, we lifted the stay of the action and denied the motion to dismiss filed by the State defendants. The State defendants

then filed an answer to the complaint and a motion for judgment on the pleadings with respect to all three counts.

After a hearing on the latter motions, another complaint was filed challenging the new districts. Demetrius Newton, the Alabama Democratic Conference, Stacey Stallworth, Framon Weaver Sr., Rosa Toussaint, and Lynn Pettway filed a complaint against the State; Bentley, in his official capacity as the Governor of Alabama; and Chapman, in her official capacity as the Secretary of State of Alabama. The Newton plaintiffs asserted three counts in their complaint: violation of section 2 of the Voting Rights Act; racial gerrymandering in violation of the Fourteenth and Fifteenth Amendments; and violations of constitutional and statutory rights under the Voting Rights Act and the Fourteenth and Fifteenth Amendments. After the Newton action was assigned to this three judge court, we determined that both the Black Caucus action and the Newton action involve common questions of law and fact and consolidated them to avoid unnecessary repetition and confusion. *See* Fed. R. Civ. P. 42(a)(2).

On December 26, 2012, 2012 WL 6706665, we denied the first motion for a partial summary judgment filed by the Black Caucus plaintiffs with respect to count one, granted the motion of the State defendants for judgment on the pleadings as to count one, denied the motion by the State defendants for judgment on the pleadings as to count two, and dismissed without prejudice count three of the complaint filed by the Black Caucus plaintiffs. We granted the Black Caucus plaintiffs leave to amend their complaint "to allege more facts and constitutional grounds to support [their] claim of political gerrymandering and to identify a judicial standard by which we can adjudicate the claim."

The Black Caucus plaintiffs timely filed an amended complaint with a new count three entitled "Partisan Gerrymandering." The amended complaint identifies as the standard of adjudication for count three "that traditional or neutral districting principles may not be subordinated in a dominant fashion by either racial or partisan interests absent a compelling state interest for doing so, particularly where the traditional districting principle is embedded in the state constitution." The complaint alleges that the Acts were "designed to promote the agenda of the partisan majority to maximize the number of seats statewide that Republicans will hold in the Legislature" and that the Acts "dilut[e] the voting strength of county residents in electing the members of their local legislative delegations by unnecessarily splitting county boundaries and including in local legislative delegations legislators who are elected in part by voters residing in other counties." The complaint also alleges that a "county's local legislative delegation effectively controls most important local government policies."

The Black Caucus plaintiffs then filed a second motion for a partial summary judgment with respect to count three. On March 27, 2013, we denied the motion for a partial summary judgment. The Black Caucus plaintiffs responded to our denial of their motion with a motion to alter or amend our order. The Black Caucus plaintiffs argued that we failed to state a reason for our decision in contradiction of Federal Rules of Civil Procedure 56(a) and 52(a)(2). Although we denied the motion, we sua *sponte* vacated our previous order, again denied the motion for a partial summary judgment, and substituted a new memorandum opinion and order. We explained that the claim of partisan gerrymandering filed by the Black Caucus plaintiffs failed to provide a judicial standard for the adjudication of the claim and that,

under any standard of adjudication, the Black Caucus plaintiffs failed to explain how they are entitled to a judgment in their favor as a matter of law. We also explained that the Black Caucus plaintiffs failed to establish the absence of a genuine issue of material fact.

On April 3, 2013, the State defendants moved for a partial summary judgment on count three, and made three arguments in support of their motion. First, the State defendants argued that the claim of partisan gerrymandering was "so closely related to the earlier county-splitting claim as to be another question of state law" that this Court lacks jurisdiction to consider. Second, the State defendants argued that the Black Caucus plaintiffs have still failed to provide the court any administrable standard by which to assess their claim of partisan gerrymandering. Third, the State defendants argued that the decision of the Eleventh Circuit in *DeJulio v. Georgia*, 290 F.3d 1291 (11th Cir.2002), establishes that the requirement of one person, one vote does not apply to local delegations in Alabama because they do not exercise "general governmental powers."

On April 17, 2013, along with their response to the motion for a partial summary judgment filed by the State defendants, the Black Caucus plaintiffs filed a motion to reconsider our denial of their second motion for a partial summary judgment and a motion for a permanent injunction. The Black Caucus plaintiffs argued that "[t]he equal protection rights of residents of any county are violated whenever any nonresidents are allowed to vote for the county's local delegation—unless the inclusion of those nonresidents is necessary to comply with statewide equal population requirements." The Black Caucus plaintiffs also argued that the Acts "unnecessarily allow[ ] nonresidents to dominate residents of a county," unnecessarily multi-

ply the number of counties that members of the House and Senate represent, and dilute "[t]he voting strength of county residents whose House or Senate district lies entirely within the county ... when compared with the voting strength of residents of the same county whose districts extend out of the county." And the Black Caucus plaintiffs argued that this matter is distinguishable from the decision of the Eleventh Circuit in *DeJulio*. In reply to the Black Caucus plaintiffs, the State defendants urged us to grant their motion for a partial summary judgment and deny the motions of the Black Caucus plaintiffs for reconsideration and for permanent injunction for the same reasons identified in their initial brief.

At a hearing on the pending motions, the Black Caucus plaintiffs announced for the first time that count three encompassed two claims: an as-applied challenge for partisan gerrymandering in violation of the First Amendment and a facial challenge to the districts based on the Equal Protection Clause of the Fourteenth Amendment. The Black Caucus plaintiffs argued that the Acts violate the Equal Protection Clause because the districts are apportioned to satisfy the requirement of one person, one vote for the Legislature as a whole, but not for the local delegations. And the Black Caucus plaintiffs argued that the districts violate the First Amendment because the Legislature allegedly acted with partisan motives when it approved the districts that dilute the votes of county voters for their local delegations. The Black Caucus plaintiffs explained that their motion for reconsideration concerns only the facial challenge under the Equal Protection Clause, not the as-applied challenge for partisan gerrymandering, even though the State defendants seek a partial summary judgment against all of count three.

Based upon the arguments made by the Black Caucus plaintiffs at the hearing, we ordered the parties to submit simultaneous briefs on the justiciability of the facial challenge to the districts based on the Equal Protection Clause of the Fourteenth Amendment. In the order, we asked the parties whether the facial challenge to the districts was ripe for our review or whether it was contingent on the decision of the next Legislature to adopt a system of local delegations at the next organizational session. We also questioned whether the Black Caucus plaintiffs could establish Article III standing to bring its claim. And we invited the parties to submit any evidence that might help us to resolve these jurisdictional questions.

The Black Caucus plaintiffs argued that the claim under the Equal Protection Clause in count three is ripe. With respect to ripeness, the Black Caucus plaintiffs asserted that their claim about the interaction of the district lines with the local delegation system is not contingent on future events because "[n]o House or Senate rule or committee structure or assignments adopted in the 2015 organizational session of the Legislature can compel an end to—or even any change in—the local delegation customs the parties now agree are in place." And the Black Caucus plaintiffs argued that they will suffer hardships as voters if judicial review of the new district lines is delayed because their votes for county delegations will be diluted. But the Black Caucus plaintiffs offered no evidence to support their assertions that the local delegations exist continuously without any action from the Legislature at the organizational session.

The Black Caucus plaintiffs also argued that they had standing to bring the claim. The Black Caucus plaintiffs explained that their injury-in-fact would be the dilution of their votes for county delegations when

the new districts are used. The Black Caucus plaintiffs disclaimed any injury that they as legislators or candidates might experience. They argued that the vote dilution of which they complain is "directly traceable to the county-blasting districts" and will be redressed by an injunction to prohibit use of the new districts.

The State defendants argued that the claim under the Equal Protection Clause is not ripe. The State defendants explained that the injury of which the Black Caucus plaintiffs complain—the interaction of the new district lines with the local delegation system—is contingent upon the decision of the next Legislature to adopt a local delegation system at its organizational session. And the State Defendants submitted the deposition testimony of the Clerk of the House and the Clerk of the Senate to establish that the Alabama House and Senate adopt their committee rules at the organizational session that follows each election. As an example of the ways in which the rules of the Legislature can change dramatically between organizational sessions, the State Defendants submitted copies of the rules adopted in the 1995 and 1999 organizational sessions to establish that the Democratic-controlled Senate in 1999 stripped the newly elected Republican Lieutenant Governor of the powers that his predecessor had exercised.

The State defendants also argued that the Black Caucus plaintiffs lacked standing to bring the claim under the Equal Protection Clause. To the extent that the Black Caucus plaintiffs had tried to assert legislative standing, the State defendants explained that the argument would fail because none of the legislators have a personal stake in the number of counties they represent. *See Raines v. Byrd,* 521 U.S. 811, 821, 829, 117 S.Ct. 2312, 2318, 2322, 138 L.Ed.2d 849 (1997). The State defen-

dants also argued that the Black Caucus plaintiffs, whether suing in their individual or legislative capacities, lack a concrete, particularized injury-in-fact because no local delegation system has been adopted for the Legislature that will be elected in 2014 and we cannot know whether the Legislature will adopt a local delegation system and, if adopted, what form it would have. And the State defendants argued that the harm alleged by the Black Caucus plaintiffs is not fairly traceable to the districts because the harm is caused by the local delegation system. Finally, the State defendants contended that "[o]nly a different system for local legislation would cure the alleged injury" because any plan that would satisfy the requirement of one person, one vote for the legislature as a whole would require the splitting of counties.

## II. DISCUSSION

We grant a summary judgment in favor of the State defendants and against the claim of partisan gerrymandering, *see* Fed. R.Civ.P. 56(a), and we dismiss for lack of subject matter jurisdiction the claim under the Equal Protection Clause. The Black Caucus plaintiffs have failed to provide a judicial standard by which we can adjudicate their claim of partisan gerrymandering. And we lack jurisdiction to consider the claim under the Equal Protection Clause both because the Black Caucus plaintiffs lack standing under Article III and because the claim is not ripe. In the alternative, controlling Eleventh Circuit precedent establishes that the challenge under the Equal Protection Clause to the interaction of the districts with the local delegation system fails as a matter of law.

A. *The Black Caucus Plaintiffs Have Failed to Provide a Standard for the Adjudication of Their Claim of Partisan Gerrymandering.*

The Black Caucus plaintiffs have failed to provide us what we sought when we dismissed their claim of partisan gerrymandering without prejudice and gave them leave to amend their complaint: "a judicial standard by which we can adjudicate the claim." Where a court "ha[s] no standard by which to measure the burden [plaintiffs] claim has been imposed on their representational rights, [plaintiffs] cannot establish that the alleged political classifications burden those same rights." *Vieth v. Jubelirer,* 541 U.S. 267, 313, 124 S.Ct. 1769, 1796, 158 L.Ed.2d 546 (2004) (Kennedy, J., concurring in the judgment). In their amended complaint, the Black Caucus plaintiffs identify the following standard of adjudication for their First Amendment claim: "[T]raditional or neutral districting principles may not be subordinated in a dominant fashion by either racial or partisan interests absent a compelling state interest for doing so, particularly where the traditional districting principle is embedded in the state constitution." But we cannot adjudicate the claim of partisan gerrymandering under this standard.

■ The standard proposed by the Black Caucus plaintiffs is inconsistent with the clear statement of Justice Kennedy in his controlling concurrence that a claim for partisan gerrymandering should not be evaluated under the standard used for a claim of racial gerrymandering. Claims of racial gerrymandering "implicate a different inquiry" from claims of partisan gerrymandering because "[r]ace is an impermissible classification" and political belief is not. *Vieth,* 541 U.S. at 307, 124 S.Ct. at 1793 (Kennedy, J., concurring in the judgment). "A determination that a gerrymander violates the law must rest on something more than the conclusion that political classifications were applied." *Id.* That determination "must rest [ ] on a conclusion that the classifications, though gen-

erally permissible, were applied in an invidious manner or in a way unrelated to any legitimate legislative objective." *Id.; see also id.* at 286, 124 S.Ct. at 1781 (plurality opinion) ("Determining whether the shape of a particular district is so substantially affected by the presence of a rare and constitutionally suspect motive as to invalidate it is quite different from determining whether it is so substantially affected by the excess of an ordinary and lawful motive as to invalidate it."). But the standard of adjudication proposed by the Black Caucus plaintiffs makes no distinction between racial and political gerrymandering. Indeed, the decisions that the Black Caucus plaintiffs offered in support of their standard involved allegations of racial, not political, gerrymandering. *Bartlett v. Strickland,* 556 U.S. 1, 6, 129 S.Ct. 1231, 1238, 173 L.Ed.2d 173 (2009); *Shaw v. Reno,* 509 U.S. 630, 636 113 S.Ct. 2816, 2821 (1993). And the standard proposed by the Black Caucus plaintiffs bears a striking similarity to one of the standards borrowed from the context of racial gerrymandering and rejected by five justices of the Supreme Court in *Vieth. See Vieth,* 541 U.S. at 284, 124 S.Ct. at 1780 (plurality opinion) (rejecting as vague and unworkable a proposed standard under which a plaintiff "must show that the mapmakers acted with a *predominant intent* to achieve partisan advantage [statewide], which could be shown by direct evidence or by circumstantial evidence that other neutral and legitimate redistricting criteria were subordinated to the goal of achieving partisan advantage"); *id.* at 308, 124 S.Ct. at 1794 (Kennedy, J., concurring in the judgment).

The Black Caucus plaintiffs conceded at the hearing on the pending motions that the standard of adjudication for their claim of partisan gerrymandering is "unknowable." When asked at the hearing how we could "allow a claim to go forward that no

one understands" and for which the Black Caucus plaintiffs "don't even know what evidence [they can] marshal to either support it or reject it," the Black Caucus plaintiffs responded that they "simply rely on the credibility of Justice Kennedy's suggestion that lower courts explore what facts might constitute a First Amendment claim." But relying on that suggestion is not enough. The Black Caucus plaintiffs bear the burden of providing us a standard to adjudicate their First Amendment claim under count three. Because they have failed to do so, they have failed to state a claim upon which relief can be granted, *see Vieth,* 541 U.S. at 313, 124 S.Ct. at 1796–97, and the State defendants are entitled to a partial summary judgment against the first claim in count three, *see* Fed.R.Civ.P. 56(a).

B. *We Lack Subject Matter Jurisdiction to Review the Black Caucus Plaintiffs' Theory Under the Fourteenth Amendment.*

■ "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal court jurisdiction to actual cases or controversies." *Raines,* 521 U.S. at 818, 117 S.Ct. at 2317 (quoting *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 37, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)). Because we have "an independent obligation to examine [our] own jurisdiction," we asked the parties to submit briefs on the justiciability of the claim brought by the Black Caucus plaintiffs under the Equal Protection Clause. *United States v. Hays,* 515 U.S. 737, 742, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995) (quoting *FW/ PBS, Inc. v. Dallas,* 493 U.S. 215, 230–31, 110 S.Ct. 596, 607–08, 107 L.Ed.2d 603 (1990)). Based on the arguments made by the parties and the evidence in the record, we must dismiss the claim under the Equal Protection Clause as nonjusticiable.

We conclude that we lack subject matter jurisdiction to consider the Black Caucus plaintiffs' claim under the Equal Protection Clause for two separate reasons. First, the claim under the Equal Protection Clause is not ripe for review. *See United Pub. Workers of Am. v. Mitchell,* 330 U.S. 75, 89–90, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947). Second, the Black Caucus plaintiffs do not meet "the irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

### 1. The Claim Under the Equal Protection Clause Is Not Ripe.

■■■■ "When determining [whether] a claim is ripe for judicial review, we consider both constitutional and prudential concerns." *Nat'l Adver. Co. v. City of Miami,* 402 F.3d 1335, 1339 (11th Cir.2005). "The ripeness doctrine is one of the several 'strands of justiciability doctrine ... that go to the heart of the Article III case or controversy requirement.'" *Mulhall v. UNITE HERE Local 355,* 618 F.3d 1279, 1291 (11th Cir.2010) (quoting *Harrell v. Fla. Bar,* 608 F.3d 1241, 1246 (11th Cir. 2010)). "Article III of the United States Constitution limits the jurisdiction of the federal courts to cases and controversies of sufficient concreteness to evidence a ripeness for review." *Digital Properties, Inc. v. City of Plantation,* 121 F.3d 586, 589 (11th Cir.1997); *see also United Pub. Workers,* 330 U.S. at 89–90, 67 S.Ct. at 564 ("The power of courts ... to pass upon the constitutionality of acts ... arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough."). "Even when the constitutional minimum has been met, however, prudential considerations may still counsel judicial re-

straint." *Digital Properties,* 121 F.3d at 589 (quoting *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 940 n. 12 (D.C.Cir.1986)). "The ripeness doctrine keeps federal courts from deciding cases prematurely, and protects them from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *United States v. Rivera,* 613 F.3d 1046, 1050 (11th Cir.2010) (internal quotation marks, citations, and alterations omitted).

■■■■ "To determine whether a claim is ripe, we assess both the *fitness* of the issues for judicial decision and the *hardship* to the parties of withholding judicial review." *Harrell,* 608 F.3d at 1258. "The fitness prong is typically concerned with questions of 'finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed.'" *Id.* (quoting *Ernst & Young v. Depositors Econ. Prot. Corp.,* 45 F.3d 530, 535 (1st Cir.1995)). "The hardship prong asks about the costs to the complaining party of delaying review until conditions for deciding the controversy are ideal." *Id.*

■■■■ The claim under the Equal Protection Clause in count three of the amended complaint of the Black Caucus plaintiffs is not yet ripe for judicial review. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 1259, 140 L.Ed.2d 406 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 580–81, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985)). Under the Constitution of Alabama, a newly elected Legislature must convene on the second Tuesday in the January immediately following the general election to organize the Legislature for the next four years. Ala.

Const. Art. IV, § 48.01; *see also* Rules of the Senate of Alabama, Alabama State Senate, *available at* http://www.legislature.state.al.us/senate/senaterules/senate rulesindex.html (last visited June 11, 2013) (explaining that the rules adopted by the Legislature elected in 2010 govern only the 2011–2014 legislative quadrennium). The Black Caucus plaintiffs allege that the re-districting Acts violate the Equal Protection Clause because of the way in which they interact with the system of local delegations, but that system has not been adopted for the Legislature that would be elected in 2014 in accordance with the new district maps. And only the newly elected Legislature will be able to adopt that system. Because we can neither know whether the Legislature elected in 2014 will adopt a system of local delegations, nor how that system, if adopted, will be structured, the claim under the Equal Protection Clause in count three rests on contingent future events and is not sufficiently concrete and definite to be fit for judicial review. And to withhold consideration of the claim at present will not cause the parties significant hardship because the use of the new districts will not, by itself, cause any harm to the interests of the Black Caucus plaintiffs. The harm of which the Black Caucus plaintiffs complain is dependent upon the future decision of the Alabama Legislature to adopt a system of local delegations.

The Black Caucus plaintiffs argue that the local delegation system has existed continuously from time immemorial, but the undisputed record evidence forecloses that argument. The Black Caucus plaintiffs bear the burden to establish our jurisdiction over their claims, *McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir. 2002), and "[i]n response to a summary judgment motion, [they] can no longer rest on [ ] 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed.R.Civ.P. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992) (internal quotation marks omitted). The State defendants have submitted sworn testimony from the clerks of both houses of the Alabama Legislature that the rules of the Legislature, including those governing local legislative delegations, are adopted each quadrennium at the organizational session. The Clerk of the House testified in his deposition that the rules and committees for the Senate "are formed in every organizational session by the speaker of the House and adopted by the House when they adopt the rules" and that the current rules and committees will expire at the end of the current Legislature. The Clerk of the Senate also testified in his deposition that the Senate "adopt[s] [its] operational rules during the organizational session at the beginning of each quadrennium." Although both the Clerk of the House and the Clerk of the Senate acknowledged that the rules for local legislation have rarely changed, both agreed that the rules are adopted in the organizational session and apply only to the sitting Legislature. The next legislature will establish its own rules and committees in January 2015. And the Black Caucus plaintiffs have submitted no evidence to contradict this testimony, but have relied solely on bald assertions in their complaint and in their brief about the continuous existence of the local delegations. Based on the undisputed record evidence, we must conclude that the claim under the Equal Protection Clause, which rests upon the interaction between the districts and the local delegation system, is contingent upon the future adoption of such a system and, as a result, is not ripe for judicial review.

Our dissenting colleague argues that the record, viewed in the light most favorable to the Black Caucus plaintiffs, would support the conclusion that the local delegations exist as a matter of custom and that the Legislature creates only the rules and standing committees during its organizational session, Dissenting Op. at 1321, but the rules and standing committees are the formal governmental mechanisms through which the local delegations operate. For example, all local legislative bills must pass through those standing committees, and it is only by the agreement of the standing committees that the local delegations are able to serve as effective gatekeepers for local legislation. To the extent that the entire theory advanced by the Black Caucus plaintiffs relies on the ability of local delegations to serve as gatekeepers for local legislation, that ability is dependent upon and enshrined in the formal rules and standing committees. And the unrebutted record establishes that those rules and standing committees are created in the organizational session held each quadrennium.

Our dissenting colleague argues, apparently in the alternative, that "the ripeness inquiry this court faces is whether it is sufficiently likely that the State will carry out the anticipated conduct that the plaintiffs contend will cause unconstitutional vote dilution," Dissenting Op. at 1319, but that argument fails. Our dissenting colleague relies for this substantial-likelihood test on a decision of the Eleventh Circuit that spoke to an entirely different circumstance than the one we face here. *See* *Mulhall,* 618 F.3d at 1291–92. In *Mulhall,* the Eleventh Circuit faced a claim that was already ripe for review because the defendant was under the compulsion of an arbitral award to take the action that would injure the plaintiff. *Mulhall,* 618 F.3d at 1292; *see also United States v. Zinn,* 321 F.3d 1084, 1088 (11th Cir.2003)

(holding that a claim was ripe where the controversy concerned a condition of a defendant's supervised release mandated by the district court in its final and immediately appealable sentencing order). And the question on appeal was whether the outcome of another lawsuit was likely to *"deprive* the plaintiff of an injury." *Mulhall,* 618 F.3d at 1291–92. But the question we face with respect to the claim advanced by the Black Caucus plaintiffs is whether the injury alleged by the Black Caucus plaintiffs will occur at all, not whether an injury that has already occurred is likely to be cured by some future contingency. Our dissenting colleague misunderstands our opinion when he suggests that the future contingency with which we are concerned is whether the State will "abolish or materially alter the system." *See* Dissenting Op. at 1320.

### 2. The Black Caucus Plaintiffs Lack Article III Standing.

Another "element of the case-or-controversy requirement is that [the plaintiffs], based on their complaint, must establish that they have standing to sue." *Raines,* 521 U.S. at 818, 117 S.Ct. at 2317. "The standing inquiry focuses on whether the plaintiff is the proper party to bring this suit, although that inquiry 'often turns on the nature and source of the claim asserted.'" *Id.* (quoting *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)) (internal citation omitted). "[S]tanding is perhaps the most important jurisdictional doctrine and, as with any jurisdictional requisite, we are powerless to hear a case when it is lacking. Simply put, once a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue." *Bochese v. Town of Ponce Inlet,* 405 F.3d 964, 974–975 (11th Cir.2005) (internal quotation marks and citations omitted).

To have standing under Article III, a plaintiff must establish three elements. "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136 (internal quotation marks omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* at 560–61, 112 S.Ct. at 2136 (internal quotation marks and alterations omitted). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561, 112 S.Ct. at 2136 (internal quotation marks omitted).

The Black Caucus plaintiffs cannot satisfy any of these elements for their claim under the Equal Protection Clause. And the failure to satisfy any of these elements is fatal to the justiciability of their claim. The Black Caucus plaintiffs cannot establish an actual or imminent injury, causation, or redressability.

The Black Caucus plaintiffs cannot establish the existence of an injury-in-fact for many of the same reasons that their claim under the Equal Protection Clause is not ripe. "A plaintiff is deemed to have suffered an injury in fact—'an invasion of a judicially cognizable interest'—when he demonstrates a harm that is '(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" *Elend v. Basham*, 471 F.3d 1199, 1207 (11th Cir.2006) (quoting *31 Foster Children v. Bush*, 329 F.3d 1255, 1263 (11th Cir.2003)). "If an action for prospective relief is not ripe because the factual predicate for the injury has not fully materialized, then it generally will not contain a concrete injury requisite for standing." *Id.* at 1205. Although "there is no per se rule denying standing to prevent probabilistic injuries," *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1162 (11th Cir.2008), "the threatened future injury must pose a 'realistic danger' and cannot be merely hypothetical or conjectural," *id.* at 1161. When a threatened future injury is dependent upon "conjecture about how individuals will intentionally act in the future," *id.* at 1163, that injury will be "cast ... into the realm of conjecture and speculation," *id.* at 1162. The Black Caucus plaintiffs argue that the implementation of the redistricting Acts during the 2014 election will violate their rights under the Equal Protection Clause because their votes for their county delegation will be diluted by the votes of non-residents. But no system of local delegation has been adopted for the Legislature that will be elected in 2014, and the injury alleged by the Black Caucus plaintiffs is dependent entirely on the independent action of a future Alabama Legislature that will be elected in accordance with the independent actions of over one million voters. The threatened injury "depend[s] on conjecture about how [at least two different groups of] individuals will intentionally act in the future"—voters and the legislators who will be elected in 2014. Viewing the evidence in the light most favorable to the Black Caucus plaintiffs, we cannot conclude that the Black Caucus plaintiffs have met their burden to establish the existence of an injury-in-fact. *Compare Henderson v. Stalder*, 287 F.3d 374, 380 (5th Cir.2002) (finding that an injury was "based in conjecture" and insufficient to support standing when it was based solely on how the plaintiffs expected the members of a Choose Life Council to administer the Choose Life Fund based on the Christian

ideologies held by those members) with *Awad v. Ziriax,* 670 F.3d 1111, 1123–24 (10th Cir.2012) (finding that an injury was not conjectural or hypothetical when it was based on a constitutional amendment in Oklahoma already passed by the Legislature and approved by the voters and subject only to certification by the state election board).

Our dissenting colleague argues that the Black Caucus plaintiffs have established the existence of an injury-in-fact because he views it as likely that the future Alabama Legislature will adopt a system of local delegations. Dissenting Op. at 1323–24. He bases that conclusion on the affidavits offered by the State defendants that the rules governing local legislation have been adopted by each legislature over the past 40 years in approximately the same form, *id.* at 18; the absence of evidence that anyone "has expressed a desire to abolish or materially alter the system," *id.* at 21; and his own theory that it would be potentially illegal under the Voting Rights Act for the Alabama Legislature to not adopt a system of local delegation because "it would have the effect of transferring power away from the black legislators who represent the majority-black counties and to the white majority of the State as a whole," *id.* at 23.

Our dissenting colleague's analysis is fundamentally flawed for at least two reasons. First, our dissenting colleague engages in unwarranted speculation about the legality of the decision of a future Alabama Legislature not to adopt a system of local delegations even though no federal court has ever considered—let alone decided—that issue. And second, our dissenting colleague incorrectly weighs the evidence in the record. Although the record contains evidence that the Alabama Legislature has adopted similar rules governing local delegations for at least the last thirty years, the record also contains evidence that the Alabama Legislature has altered longstanding rules in response to political changes in memberships. Notably, the Democratic majority in the Alabama Senate elected in November 1998 dramatically reduced the power of the Lieutenant Governor when a Republican was elected to that position. Contrary to the suggestion of our dissenting colleague, the requirement that we view the evidence in the light most favorable to the Black Caucus plaintiffs does not require us to disregard this unrebutted evidence about a jurisdictional fact, but instead to weigh it against the other evidence in the record. And, contrary to the suggestion of the dissent, the absence of evidence does not weigh in favor of the Black Caucus plaintiffs. The Black Caucus plaintiffs bear the burden to put forth affirmative evidence in the record to establish their standing, and we invited them to do so. But the Black Caucus plaintiffs instead rested on their bare allegations and offered us no evidence. The evidence presented by the State defendants, when viewed in the light most favorable to the Black Caucus plaintiffs, establishes the absence of an actual, not conjectural or hypothetical, injury-in-fact.

The Black Caucus plaintiffs also cannot satisfy the second element of standing because the allegedly unconstitutional interaction between the redistricting Acts and the local delegations is not fairly traceable to the implementation of the redistricting Acts. Standing requires "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136 (quoting *Simon v. E. Ky. Welfare Rights. Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450

(1976)). The Black Caucus plaintiffs argue that the redistricting Acts violate the Equal Protection Clause when they provide for the election of legislators who, in turn, represent unequal numbers of county voters in the local delegations, but the redistricting Acts do not create or otherwise provide for the local delegations. Only the next Alabama Legislature can create the system of local delegations. Because the constitutional injury alleged by the Black Caucus plaintiffs under the Equal Protection Clause can arise only if the next Alabama Legislature adopts a system of local delegations at its organizational session, the injury of which they complain is not "fairly traceable" to the State defendants' enforcement of the redistricting Acts.

■ Our dissenting colleague argues that "[t]he injury alleged in this case is caused by the redistricting plans as much as it is by the rules affording all Local Delegation members equal power," Dissenting Op. at 1324, but that argument fails. Although "the fact that the harm to petitioners may have resulted indirectly does not in itself preclude standing," it may make it "substantially more difficult ... to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Warth v. Seldin,* 422 U.S. 490, 504–05, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975). "[The Black Caucus plaintiffs] must allege facts from which it reasonably could be inferred that, absent the [redistricting plans], there is a substantial probability that [their rights to elect representatives for their local delegations in accordance with the requirement *of one person, one vote* would not have been infringed] and that, if the court affords the relief requested, the asserted [infringement] of [the rights of the Black Caucus plaintiffs] will be removed." *See*

*id.* at 504, 95 S.Ct. at 2208. But the Black Caucus plaintiffs cannot make this showing because, even if the Legislature had adopted their proposed plans or maintained the malapportioned plans from 2000, the local delegations would still not be elected in accordance with the requirement of one person, one vote. The Black Caucus plaintiffs, who bear the burden to establish our jurisdiction, have submitted no evidence that it would even be possible for the Legislature to adopt districts that would elect legislators in accordance with the requirement of one person, one vote for both the Alabama Legislature and the local delegations.

■ The Black Caucus plaintiffs also cannot satisfy the third element of standing because an injunction to prevent the use of the redistricting Acts would not remedy the injury caused by the adoption of a local delegation system at a future organizational session of a Legislature elected in accordance with different district maps. For an injury to be redressable, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision." *Lujan,* 504 U.S. at 561, 112 S.Ct. at 2136 (quoting *E. Ky. Welfare Rights,* 426 U.S. at 38, 43, 96 S.Ct. at 1924, 1926). As the Eleventh Circuit has explained, "Redressability is established when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.,* 647 F.3d 1296, 1303–04 (11th Cir.2011). The only remedy sought by the Black Caucus plaintiffs is an injunction to prevent the use of the new district maps. The Black Caucus plaintiffs have repeatedly asked us not to enjoin the use of local delegations. At oral argument, the Black Caucus asserted that such an injunction "would fly squarely in

the face of *DeJulio*." And in their brief on justiciability, the Black Caucus plaintiffs contended that "[a]ny change in the local delegation customs would not be desirable and might be unlawful." But an injunction to prevent the use of the redistricting acts would not "amount to a significant increase in the likelihood" that the Black Caucus plaintiffs' votes for the members of their local delegations would satisfy the requirement of one person, one vote. Neither the Acts, nor the proposed plans of the Black Caucus plaintiffs, nor the districts created in 2002 satisfy that requirement, and no party has contended that it would be possible to create a plan that is equitably apportioned at both the statewide and local delegation levels.

We also could not enjoin the Legislature from adopting a system of local delegation because the presently unknown officers of the next legislature are not parties to this appeal. *See Lujan*, 504 U.S. at 568–69, 112 S.Ct. at 2140–41 (explaining that "redress of the only injury in fact respondents complain of requires action (termination of funding until consultation) by the individual funding agencies; and any relief the District Court could have provided in this suit against the Secretary was not likely to produce that action" because the agencies were not parties in the matter). The only official who is a named defendant in this action is Beth Chapman, in her official capacity as Secretary of State, who is not responsible for or in any way connected to the decision of the Legislature to adopt a local delegation system. And for the same reasons described above, an injunction to prevent the use of the new districts would not redress an injury caused by the failure to elect the members of the local delegations in accordance with the requirement of one person, one vote.

Our dissenting colleague argues that this claim is redressable because "a redistricting remedy by itself could remedy the one-person, one-vote violation in at least some Local Delegations," Dissenting Op. at 1324, but a failure to comply with the requirement of one person, one vote is not the sort of injury that can be redressed by partial compliance. Unlike global warming or illegal immigration, both of which could be somewhat ameliorated by judicial action, *see Massachusetts v. EPA*, 549 U.S. 497, 526, 127 S.Ct. 1438, 1458, 167 L.Ed.2d 248 (2007); *Chiles v. United States*, 69 F.3d 1094, 1096 (11th Cir.1995), a governmental body is either elected in accordance with the requirement of one person, one vote, or it is not. No court has held that partial compliance can be sufficient to redress an injury caused by inequitable apportionment.

And our dissenting colleague's view of redressability is logically inconsistent with the position he takes with respect to ripeness. Our dissenting colleague would rule that the claim under the Equal Protection Clause is ripe because "[t]he evidence overwhelmingly indicates that the Local Delegations system will almost certainly continue to exist with Alabama's next Legislature," Dissenting Op. at 1322, and because any deviation from that local delegation system "would raise serious concerns under the Voting Rights Act," *id.* at 23. But our dissenting colleague also contends that a decree from our court that the redistricting acts violate the requirement of one person, one vote because of the local delegation system "would alter legal duties such that the injury would be remedied in part (that is, in some Local Delegations), and, two, the practical consequences of the decree would be a significant increase in the likelihood that the injury would be remedied in full (that is, in all Local Delegations across the State)." *Id.* at 38 (internal quotation marks omitted). We do not understand, nor do we expect that the State defendants would understand, how

they could remedy the injury alleged by the Black Caucus plaintiffs when, on the one hand, no party has offered any plan that would satisfy the requirement of one person, one vote for both the Legislature and the local delegations, and, on the other hand, any elimination of the local delegations system would be "potentially unlawful."

Although we conclude that the claim under the Equal Protection Clause of count three is nonjusticiable, local delegations in Alabama are not insulated from judicial review. The Black Caucus plaintiffs could have sued the officers of the Alabama Legislature to challenge the current system of local delegations. *See DeJulio,* 290 F.3d at 1292–3. And, if the next Legislature were to adopt a system of local delegations, the Black Caucus plaintiffs could then challenge that system and seek to enjoin its use. That challenge would be brought before a single-judge district court, with review in the Eleventh Circuit, not before a three-judge district court. *See* 28 U.S.C. § 2284. But a challenge to hypothetical local delegations cannot be brought as a challenge to the redistricting Acts.

C. *In the Alternative, the Black Caucus Plaintiffs' Theory Under the Fourteenth Amendment Fails Under Binding Eleventh Circuit Precedent.*

We also conclude, in the alternative, that the State defendants have established that they are entitled to a partial summary judgment against the second claim in count three. The second claim presents a facial challenge under the Equal Protection Clause based on the interaction between the local legislative system of Alabama and the voting districts for the Legislature as a whole. At the hearing on the pending motions, the Black Caucus plaintiffs alleged that, because the districts are apportioned to satisfy the re-

quirement of one person, one vote only for the Legislature as a whole, "the[ ] redistricting acts dilute[ ] the votes of county voters within [ ] count[ies][ ] governed by a local legislative delegation."

As with their claim under the First Amendment, the Black Caucus plaintiffs have failed to identify the constitutional standard that we should employ to adjudicate this claim under the Equal Protection Clause. The Black Caucus plaintiffs argue that, when a state enacts voting districts that elect members "for both the state legislature and for local legislative delegations, which exercise general governing authority over counties, the state can deviate from the principle of one-person, one-vote for the local delegations only to the extent that such deviations are necessary to comply with one-person, one-vote . . . for the legislature as a whole." But the Black Caucus plaintiffs fail to define the word "necessary" or provide any other standard with which we could adjudicate this claim. To the extent that the Black Caucus plaintiffs argue that a deviation is "unnecessary" unless it is based on the whole-county provisions of the Alabama Constitution, we rule, as we did when we dismissed count one of the initial complaint, that we lack the subject-matter jurisdiction to entertain a claim that state officials violated state law. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 117, 104 S.Ct. 900, 917, 79 L.Ed.2d 67 (1984). And the Black Caucus plaintiffs have not explained why, if the requirement of one person, one vote applies to the election of local delegations, the rights of county voters should be subrogated to the rights of state voters.

Controlling Eleventh Circuit precedent also establishes that the local delegations in Alabama are not subject to the requirement of one person, one vote. Sitting as a three-judge district court within the Elev-

enth Circuit, we are bound by Eleventh Circuit precedent. And the decision in *DeJulio* establishes that local delegations in Alabama do not exercise general governmental functions and, as a result, are not subject to the requirement of one person, one vote. *See* 290 F.3d at 1296. But even if we were not bound by *DeJulio*, we would conclude that local delegations in Alabama are not subject to the requirement of one person, one vote.

### 1. This Court Is Bound by Eleventh Circuit Precedent.

 It is well settled that we are bound by Eleventh Circuit precedent when we sit as a three-judge district court. Three-judge district courts within the former Fifth Circuit have so held. *See Ala. NAACP State Conf. of Branches v. Wallace,* 269 F.Supp. 346, 350 (M.D.Ala.1967) (three-judge court) ("It is the clear duty of this [three-judge] district court to follow the decision of our Court of Appeals"); *Willis v. Pickrick Rest.,* 231 F.Supp. 396, 400 (N.D.Ga.1964) (three-judge court) (noting that Fifth Circuit decisions are binding on a three-judge district court). And the former Fifth Circuit reasoned that three-judge courts are bound by decisions of the circuit court. *See Finch v. Miss. State Med. Ass'n, Inc.,* 585 F.2d 765, 773 (5th Cir.1978) (explaining that "[i]n *Athanson v. Grasso,* the three-judge court was required to analyze carefully the interpretation placed upon *Allen* in City *of New York* and *Aguayo* because, as a district court within the Second Circuit, it was bound to follow the law of the circuit" (citation omitted)).

Although our dissenting colleague suggests that there exists some debate about this issue, see Dissenting Op. at 1342–43 n. 13, he does not deny that no three-judge district court outside of the Eleventh Circuit has ever held that it is not bound by the precedents of its circuit court. Three-

judge district courts outside of this circuit instead have repeatedly held that they are bound by the precedents of their circuit courts. *See Parker v. Ohio,* 263 F.Supp.2d 1100, 1105 (S.D.Ohio 2003) (three-judge court) ("While plaintiffs are correct that the First Circuit and the Supreme Court have not yet ruled on influence districts, we are bound by precedent in this circuit."); *Baksalary v. Smith,* 579 F.Supp. 218, 226 n. 13 (E.D.Pa.1984) (three-judge court) ("We [ ] feel ourselves bound not only by pertinent decisions of the Supreme Court, but also by pertinent decisions of the Court of Appeals for the Third Circuit."); *Russell v. Hathaway,* 423 F.Supp. 833, 835 (N.D.Tex.1976) (three-judge court) ("A three-judge court is bound by apposite decisions of the Court of Appeals for its circuit. The addition by Congress in the three-judge court acts of a second district judge and a Circuit Judge together with direct appeal to the Supreme Court was not a grant of authority with elevated precedential stature but a withdrawal of power from a single judge."); *Athanson v. Grasso,* 411 F.Supp. 1153, 1157 (D.Conn. 1976) (three-judge court) ("As a district court, although composed of three judges, we are required to follow the law of our own circuit insofar as it is pertinent."); *Hamar Theatres, Inc. v. Cryan,* 390 F.Supp. 510, 512 (D.N.J.1974) (three-judge court) ("We, as a district court, albeit a Three–Judge Court, are similarly bound by the precedent of *Cine–Com,* a Court of Appeals decision in this Circuit." (citations omitted)); *Wilczynski v. Harder,* 323 F.Supp. 509, 513 n. 8 (D.Conn.1971) (three-judge court) ("Sitting as a district court, this panel is bound by decisions of the court of appeals for this circuit."). And both the Second and Fourth Circuits have suggested that three-judge district courts within their circuits are bound by the precedent of their respective circuits. *See Lewis v. Rockefeller,* 431 F.2d 368, 371 (2d

Cir.1970) ("[E]ven if a three-judge court were to be convened here, it would sit as a district court and be bound by the decision of this court in [a previous Second Circuit decision]."); *Jacobs v. Tawes*, 250 F.2d 611, 614 (4th Cir.1957) ("The court of three judges is not a different court from the District Court, but is the District Court composed of two additional judges sitting with the single District Judge before whom the application for injunction has been made." (internal citation omitted)).

▇▇▇ The settled view that three-judge district courts are bound by circuit precedent is consistent with the structure of a three-judge district court. 17A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, & VIKRAM DAVID AMAR, Federal Practice and Procedure § 4235, at 224 (3d ed. 2007) ("Far the more common view ... is that the three-judge court is sitting as a district court and is bound by decisions of the court of appeals for its circuit."). A three-judge district court is still a district court within the ordinary hierarchical structure of the federal judiciary. "Congress established the three-judge-court apparatus for one reason: to save state and federal statutes from improvident doom, on constitutional grounds, at the hands of a single federal district judge." *Gonzalez v. Automatic Emp. Credit Union*, 419 U.S. 90, 97, 95 S.Ct. 289, 294, 42 L.Ed.2d 249 (1974). For this reason, the Supreme Court has refused to exercise mandatory appellate review over decisions of three-judge courts that "den[y] a plaintiff injunctive relief on grounds which, if sound, would have justified dissolution of the court as to that plaintiff, or a refusal to request the convention of a three-judge court *ab initio*." *Id.* at 101, 95 S.Ct. at 296. Instead, the Court has required appellate review of those decisions by the circuit courts in which those three-judge district courts were convened. *Id.* Be-

cause circuit courts can review some decisions of three-judge district courts, it would be illogical to contend that three-judge district courts are not bound by circuit precedent on at least some issues. And because no clear line can be drawn between precedents that are binding and those that are not, we accept the settled view that a three judge district court convened within the Eleventh Circuit is, like all other district courts within the circuit, bound by circuit precedent.

2. The Decision of the Eleventh Circuit in *DeJulio* Forecloses the Challenge to the Acts Based on the Dilution of County Voters in the Election of Local Delegations.

▇▇▇ Under binding Eleventh Circuit precedent, the equal protection claim in count three fails as a matter of law. The Black Caucus plaintiffs argue that the Acts violate the Equal Protection Clause because they dilute the votes of county voters for members of the local delegations. The Supreme Court has explained as follows that local government officials are subject to the requirement of one person, one vote under the Fourteenth Amendment only when the officials are selected by popular election to perform governmental functions:

[W]henever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election, and when members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials.

*Hadley v. Junior Coll. Dist.,* 397 U.S. 50, 56, 90 S.Ct. 791, 795, 25 L.Ed.2d 45 (1970). The Eleventh Circuit held in *DeJulio* that local delegations in Georgia are not subject to the requirement of one person, one vote because the legislature, not the local delegations, is engaged in the governmental function of lawmaking. 290 F.3d at 1296. Because the parties agree that the local delegation system is virtually the same in Alabama as it is in Georgia, we must conclude that the local delegations in Alabama are not subject to the requirement of one person, one vote and the equal protection claim in count three fails as a matter of law.

*DeJulio* involved a challenge to the local delegation system in Georgia as violative of the requirement of one person, one vote. Each county, municipality, or other jurisdiction in Georgia has a local delegation that consists of "any legislator whose district encompasses territory within a specific city or county." 290 F.3d at 1293. "Local bills" that apply only to a particular county, municipality, or other jurisdiction are sent to the delegation, which then makes recommendations to standing committees in the House and Senate. *Id.* To receive a "do pass" recommendation from the standing committee in the House, the local delegation must be unanimously in favor of the legislation. *Id.* To receive a "do pass" recommendation from the standing committee in the Senate, Senate Rule 187(u) requires the approval of a majority of the local delegation. *Id.* Because members of the Georgia Legislature "become delegation members by virtue of their popular election, not through appointment," the Eleventh Circuit concluded that the delegations are "popularly elected." *Id.* at 1295. But the Eleventh Circuit also concluded that the delegations do not "engage in governmental functions" because all legislation has to be passed by the legislature

and signed by the Governor. *Id.* (internal quotation marks omitted).

In *DeJulio,* the Eleventh Circuit considered and rejected the argument that local delegations carry out the general governmental function of lawmaking. The court explained that a local bill had to receive at least a majority vote from a delegation to be reported with a "do pass" recommendation to the Georgia House and Senate, and when local legislation received the requisite level of support from the local delegation, ordinarily the Georgia Legislature enacted the legislation "on an uncontested basis as a matter of local courtesy." *Id.* at 1296. But nothing in Georgia law required the legislature to defer to local courtesy. *Id.* Members of the House or Senate could contest local bills, and the court held that the lack of such contests did not "render plenary authority to the local delegations with respect to the enactment of local legislation." *Id.* The court explained that, although delegations were given substantial deference with respect to local legislation, local legislation was not enacted until it was "voted on by a majority of the full House and Senate and signed by the Governor." *Id.* The court held that the Georgia Legislature, not the delegations, engaged in lawmaking. *Id.*

The local delegations in the Alabama Legislature perform materially the same role as the local delegations in the Georgia Legislature. A local delegation for a particular county in the Senate consists of all senators whose districts include any portion of that county. And the members of a local delegation must approve any local legislation that would affect the county before that legislation may be considered by one of the four Local Legislation Committees in the Senate. Depending upon the internal protocols of each local delegation, local legislation can move forward after either a majority vote in favor of the

legislation or a unanimous vote in favor of the legislation. Although local legislation is often uncontested on the Senate floor as a matter of local courtesy, there is no Senate rule that requires deference to delegations. Local legislative delegations in the House also consist of all representatives whose districts include a portion of the particular county, and these local delegations must approve local legislation before it is sent to the House floor. House members are free to oppose local legislation on the floor, but local legislation is often uncontested as a matter of courtesy. Nevertheless, local legislation, like all other legislation, is not officially enacted until it is approved by majorities of both houses and signed by the Governor or approved by majorities of both houses over the veto of the Governor. As the Black Caucus plaintiffs have conceded in both filings to this Court and at the hearing on the pending motions, the local legislative system in Georgia is "virtually the same [as] Alabama's."

The record contains several news articles, submitted by the State defendants without objection, about Alabama legislators who disregarded local courtesy to prevent the enactment of certain pieces of local legislation. According to one article, Representative Johnny Mack Morrow stated his intention to "file a written notice [to] contest all local legislation in the Alabama House of Representatives" because the Alabama Legislature did not override a gubernatorial veto of legislation he sponsored. That article also reported that Representative Craig Ford filed a notice to contest all local legislation as part of a strategy to slow the business of the Alabama Legislature. And another news article reported that Representative Joseph Mitchell contested at least two pieces of local legislation that affected his county, even though a majority of his local delegation had approved the legislation. These examples, all occurring in 2013, establish that local courtesy, although prevalent, can be thwarted by the objection of a single legislator. And the Black Caucus plaintiffs conceded at the hearing that these articles were accurate and that legislators can and have disregarded local courtesy.

The Black Caucus plaintiffs attempt to distinguish their facial challenge from the one in *DeJulio* on the ground that *DeJulio* involved a direct challenge to the local legislative system and count three challenges "the statutory boundaries that define who the member of each local delegation will be," but this argument fails. The argument advanced by the Black Caucus plaintiffs cannot be squared with an issue actually decided in *DeJulio*: that elected members of local delegations, like those in Georgia, do not perform governmental functions of the kind that would subject them to the requirement of one person, one vote under the Fourteenth Amendment. *See* 290 F.3d at 1296. We have no basis on which to conclude that the Acts violate the requirement of one person, one vote because of the effect they have on the local delegations when that requirement does not apply to the local delegations at all. *See Hadley*, 397 U.S. at 56, 90 S.Ct. at 795.

In the end, this facial claim would make more sense if it had been brought as a direct challenge to the local delegation system instead of the redistricting Acts. The Acts are not responsible for the local delegation system in Alabama. The rules for local delegations are created by the action of newly elected legislators at the organizational session held each quadrennium. Even if we were to enjoin the use of the Acts for elections, a new legislature, elected in accordance with new district maps, could still adopt the same system of local delegation. To the extent that the Black Caucus plaintiffs challenge the district

lines instead of the local legislative system to avoid the adverse circuit precedent in *DeJulio,* we reject that strategy.

In a final attempt to escape the conclusion that their claim fails as a matter of law under *DeJulio,* the Black Caucus plaintiffs challenge that decision as wrong, but we cannot accept that argument. The Black Caucus plaintiffs contend, *"DeJulio's* conclusion that local delegations are not exercising general governmental functions, notwithstanding the gatekeeping and local courtesy customs that empower local delegations in Georgia, just as they do in Alabama, was erroneous." Even if we agreed with that dubious proposition, we would lack the power to deviate from the controlling precedent of the Eleventh Circuit. *See Wallace,* 269 F.Supp. at 350 ("It is the clear duty of this [three-judge] district court to follow the decision of our Court of Appeals. All of the cases which have spoken on the subject so hold."). The State defendants have established that they are entitled to judgment as a matter of law on the equal protection claim in count three under DeJulio and that no genuine dispute of a material fact would prevent the entry of a partial summary judgment in their favor. *See* Fed.R.Civ.P. 56(a).

3. Even If We Were Not Bound by *De-Julio,* We Would Conclude that the Alabama Local Delegations Do Not Exercise Governmental Functions.

Even if we were not bound by the decision of the Eleventh Circuit in *DeJulio,* we would conclude that local delegations in Alabama are not subject to the requirement of one person, one vote. Supreme Court precedent makes clear that the requirement of one person, one vote applies only when "a state or local government decides to select persons by popular election to perform governmental functions." *Hadley,* 397 U.S. at 56, 90 S.Ct. at 795. And local delegations do not perform the kind of governmental functions identified by the Supreme Court as necessary to subject a local governmental official to the requirement of one person, one vote.

The exercise of governmental functions was a key factor in the decision of the Supreme Court to apply the requirement of one person, one vote to the board of trustees of a consolidated junior college district at issue in Hadley. The Court explained that, in *Avery v. Midland County,* 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), it had applied the one person, one vote principle to a local election "where the elected officials exercised 'general governmental powers over the entire geographic area served by the body.' " *Hadley,* 397 U.S. at 53, 90 S.Ct. at 793 (quoting *Avery,* 390 U.S. at 485, 88 S.Ct. at 1120). And the Court applied that principle in *Hadley,* where the trustees "perform[ed] important governmental functions within the districts" and exercised powers "general enough" and with "sufficient impact throughout the district." *Id.* at 53–54, 90 S.Ct. at 794. As examples of these governmental functions, the Court noted that the trustees "can levy and collect taxes, issue bonds with certain restrictions, hire and fire teachers, make contracts, collect fees, supervise and discipline students, pass on petitions to annex school districts, acquire property by condemnation, and in general manage the operations of the junior college." *Id.* at 53, 90 S.Ct. at 794. Officials selected by popular election who do not perform important governmental functions would not fall within the *Hadley* rule. *See id.* at 53–54, 90 S.Ct. at 794. But the Court further explained that, even when the officials do perform important governmental functions that would otherwise fall within the scope of the rule it announced, "there might be some case in which a State elects certain functionaries whose duties are so far removed from

normal governmental activities and so disproportionately affect different groups" that the election of those functionaries need not comply with the requirement of one person, one vote. *Id.* at 56, 90 S.Ct. at 795.

Since *Hadley,* the Supreme Court has considered, on three occasions, the scope of the rule it established in *Hadley. See Ball v. James,* 451 U.S. 355, 371, 101 S.Ct. 1811, 1821, 68 L.Ed.2d 150 (1981); *Associated Enters., Inc. v. Toltec Watershed Improvement Dist.,* 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973); *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.,* 410 U.S. 719, 730, 93 S.Ct. 1224, 1231, 35 L.Ed.2d 659 (1973). In *Salyer* and *Associated Enterprises,* the Supreme Court concluded that two water districts fell within the exception identified in *Hadley* for special-purpose functionaries. *See Associated Enters.,* 410 U.S. at 745, 93 S.Ct. at 1238; *Salyer,* 410 U.S. at 728, 93 S.Ct. at 1229. The Court explained that the water storage district in *Salyer* was "vested with some typical governmental powers," including the power to take private property for the construction of district projects, the power to contract for the construction of those projects, and the power to employ and discharge its staff, but it had "relatively limited authority" and its actions "disproportionately affect[ed] landowners." *Id.* at 728–29, 93 S.Ct. at 1230. And in *Associated Enterprises,* the Court reasoned that the water district fell within the special purpose exception to the rule in *Hadley. See* 410 U.S. at 744, 93 S.Ct. at 1237. The Court also explained that the "statute authorizing the establishment of improvement districts was enacted by a legislature in which all of the State's electors have the unquestioned right to be fairly represented." *Id.,* 93 S.Ct. at 1237–38. But in *Ball,* the Court said more than in either *Salyer* or *Associated Enterprises.* The Court explained

that the water district in *Ball* "d[id] not exercise the sort of governmental powers that invoke the strict demands of *Reynolds.*" 451 U.S. at 366, 101 S.Ct. at 1818. And the Court reasoned, in the alternative, that, even if one were to accept the governmental functions as described by the Court of Appeals, "[a]s in *Salyer,* the nominal public character of [the] entity c[ould not] transform it into the type of governmental body for which the Fourteenth Amendment demands a one-person, one-vote system of election." *Id.* at 368, 101 S.Ct. at 1819.

The decisions of the Supreme Court in *Hadley, Salyer,* and Ball guide our understanding of the kinds of governmental functions or powers that officials must exercise for their popular election to be subject to the requirement of one person, one vote. The body that administers a school system, for example, performs a "vital governmental function" that triggers the requirement of one person, one vote for the election of its members. *See Hadley,* 397 U.S. at 56, 90 S.Ct. at 795. And the elected body that provides general public services, including police, fire, "housing, transportation, utilities, roads, or anything else of the type ordinarily financed by a municipal body" performs the kind of governmental function that triggers the requirement of one person, one vote. *See Salyer,* 410 U.S. at 729, 93 S.Ct. at 1230. And the same can be said for the elected bodies with the power to impose ad valorem property taxes or sales taxes; the power to enact laws to govern the conduct of citizens; and the power to administer sanitation, health, and welfare services are all important and traditional governmental powers. *See Ball,* 451 U.S. at 366, 101 S.Ct. at 1818. By contrast, "the provision of electricity is not a traditional element of governmental sovereignty and so is not in itself the sort of general or important gov-

ernmental function that would make [a] government provider subject to the doctrine of the *Reynolds* case." *Id.* at 368, 101 S.Ct. at 1819–20 (internal citation omitted).

■ The local delegations in Alabama do not exercise general governmental powers or functions of the kind that the Supreme Court has identified as necessary to trigger the requirement of one person, one vote. As a matter of courtesy, local delegations review and recommend local legislation to the Alabama Legislature as a whole. Local delegations exercise no general regulatory powers over counties; that is, local delegations cannot impose taxes; administer schools; or provide emergency services, housing, transportation, utilities, roads, sanitation services, health services, or welfare. *See Ball,* 451 U.S. at 366, 101 S.Ct. at 1818. And local delegations cannot enact laws for the counties. *See id.* Local legislation must be passed by a majority of the legislature and signed by the governor, or passed by a majority of the legislature over a governor's veto. Although the practice of local courtesy makes it likely that local legislation recommended by the local delegations will be passed by the Alabama Legislature, that likelihood depends entirely on the will of the whole body, which need not continue or honor the practice of local courtesy. Because local delegations do not exercise any general regulatory powers and the power of lawmaking is reserved to the legislature as a whole, we cannot conclude that local delegations "perform important governmental functions" that are "general enough" and with "sufficient impact" to justify the extension of *Reynolds* to the election of local delegations. *See Hadley,* 397 U.S. at 53–54, 90 S.Ct. at 794.

Our dissenting colleague would apply the requirement of one person, one vote to all governmental bodies unless they fall within the special purpose exception described in *Hadley,* Dissenting Op. at 1335, but the Supreme Court made clear in *Hadley* that the requirement of one person, one vote applies only when "a state or local government decides to select persons by popular election to perform governmental functions." 397 U.S. at 56, 90 S.Ct. at 795. That statement necessarily implies that the requirement of one person, one vote does not apply when the officials either are not popularly elected or do not perform governmental functions. And the Court reiterated in *Salyer* that it had extended the requirement of one person, one vote to school districts exercising powers that "show[ed] that the trustees perform[ed] important governmental functions within the districts, and [that were] general enough and ha[d] sufficient impact throughout the district to justify the" application of the requirement. *Salyer,* 410 U.S. at 727, 93 S.Ct. at 1229 (quoting *Hadley,* 397 U.S. at 53–54, 90 S.Ct. at 794).

Several courts have concluded that state and local government officials do not exercise governmental functions of the sort that trigger the requirement of one person, one vote for their elections when the officials only recommend action to voters or to another governmental body that is apportioned in compliance with the requirement of one person, one vote. *See Educ./Instruccion, Inc. v. Moore,* 503 F.2d 1187, 1189 (2d Cir.1974) (concluding that a regional council did not have to comply with the requirement of one person, one vote because the "powers and functions of the council[ ] are essentially to acquire information, to advise, to comment and to propose," none of which constituted governmental functions within the meaning of *Hadley*); *Driskell v. Edwards,* 413 F.Supp. 974, 977–78 (W.D.La.1976) (three-judge court) (concluding that "the principles of one-man, one vote had no application to the selection of delegates to the

Louisiana Constitutional Convention of 1973" at least in part because "[n]o act of the Convention takes on the force of law unless and until ratified by the people in a referendum election"); *McMillan v. Love,* 379 Md. 551, 842 A.2d 790, 799–801 (2004) (reasoning that the Anne Arundel County delegation operates in a factually analogous manner as the local delegations in Georgia and concluding that the delegation is not subject to the requirement of one person, one vote because the delegation only refers and recommends legislation to the Maryland General Assembly); *Polk Cnty. Bd. of Sup'rs v. Polk Commonwealth Charter Comm'n,* 522 N.W.2d 783, 788–90 (Iowa 1994) (concluding that the Mayors' Commission, which studies and formulates resolutions that are proposed to the Commonwealth Council to be approved, rejected or amended by that body, is not subject to the requirement of one person, one vote because it cannot meet the "threshold determination [that] the body performs governmental functions"); *see also Kessler v. Grand Cent. Dist. Mgmt. Ass'n, Inc.,* 158 F.3d 92, 95–96, 107 (2d Cir.1998) (concluding that the Grand Central Management Association, which employed security guards and sanitation workers, assisted retailers in improving the attractiveness of the district, contributed to the funding and operation of an outreach facility for homeless persons, and operated tourist information booths, fell within the special purpose exception under *Salyer* because its functions were overseen by the City, served a narrow purpose, and were secondary to the services provided by the City). These courts argue that the Supreme Court has made clear that a state or local official must perform governmental functions to be subject to the requirement of one person, one vote. Because local delegations in Alabama do not perform those functions, we would conclude, even absent the binding precedent of *DeJulio,* that the equal

protection claim in count three fails as a matter of law.

Our dissenting colleague argues that the decision in Polk was based on the flawed reasoning of the Missouri Supreme Court overturned by the Supreme Court in *Quinn v. Millsap,* 491 U.S. 95, 109 S.Ct. 2324, 105 L.Ed.2d 74 (1989), Dissenting Op. at 1341, but we disagree. In *Quinn,* the Supreme Court of the United States reversed a decision of the Supreme Court of Missouri that "the Equal Protection Clause ha[d] no relevancy" to a membership requirement for a board of freeholders that did not exercise general governmental powers. *Id.* at 104–05, 109 S.Ct. at 2330. The Supreme Court of the United States explained that the Supreme Court of Missouri had conflated the one person, one vote requirement with the Equal Protection Clause. *See id.* But a state or local body must respect the general demands of the Equal Protection Clause even when the election of its members is not governed by the requirement of one person, one vote. *See id.* at 104–05, 109 S.Ct. at 2330–31. The Supreme Court of Iowa made no such error in Polk; the court held only that "the Mayors' Commission does not exercise general governmental powers" and, therefore, "the one person, one vote constitutional principle is not violated by the structure of the proposed commonwealth charter." *Polk,* 522 N.W.2d at 790.

Our dissenting colleague also suggests that, after its decision in *Educ./Instruccion,* the Second Circuit rejected our reasoning in *Baker v. Regional High School District Number 5,* 520 F.2d 799 (2d Cir. 1975), Dissenting Op. at 1341 n. 12, but that decision is distinguishable. *Baker* involved a one person, one vote challenge to a school board that had the power to initiate and propose budgets to the voters for ratification, to propose bond ordinances to

the voters, to hire and fire teachers, to supervise and discipline students, and to manage all of the schools in the district. *Id.* at 801–02. The Second Circuit explained that, in the light of these powers, "there can be no question but that the board members perform important governmental functions within the districts and ... these powers are general enough and have sufficient impact throughout the district to justify the conclusion that [one person-one vote] should be applied here." *Id.* at 802 (quoting *Hadley,* 397 U.S. at 53–54, 90 S.Ct. at 794). Although the Second Circuit suggested that the gatekeeping role of the school board was an important governmental function, *id.,* that gatekeeping role differed significantly from the role of the local delegations. The school boards exercised actual regulatory authority over the schools, and the voters could consider only proposals recommended to them by the school boards, *id.* at 801–02. By contrast, the local delegations have no regulatory authority and operate solely by virtue of informal courtesy. The Alabama Legislature could deviate from the recommendations of local delegations at any time.

Our dissenting colleague also argues that our reasoning that the governmental function of lawmaking is carried out by the Legislature, not the local delegations, is flawed because neither house of the legislature by itself can make laws, Dissenting Op. at 1338, but that argument fails too. The passage of legislation by each house of the legislature is a traditional government function and quintessential aspect of governmental sovereignty. *See Ball,* 451 U.S. at 368, 101 S.Ct. at 1819. And the Supreme Court has explicitly held that "seats in both houses of a bicameral state legislature must be apportioned on a population basis," so we need not engage in the analysis under *Hadley* at all. *See Reynolds,* 377 U.S. at 568, 84 S.Ct. at 1385.

Our dissenting colleague's reading of the relevant precedents would radically expand the scope of the one person, one vote requirement. All legislatures, including the Alabama Legislature, rely on committees to facilitate their work. In Alabama, each house of the legislature has several committees charged with examining bills on a particular subject matter and recommending action on those bills to the House or Senate. *See* Ala. Const. Art. IV, § 62. And the Rules Committee of each house determines the order in which bills that have been reported from the committees may be considered by the House or Senate. If our dissenting colleague were correct that the "gatekeeping function" performed by the legislative delegations triggers the requirement of one person, one vote, then that requirement would, as a matter of logic, apply to other legislative committees as well. We agree with the reasoning of the district court in *DeJulio* that "a mere advisory role in lawmaking as typically exists with legislative committees, subcommittees, and local legislative delegations cannot trigger the 'one person, one vote' requirement." *DeJulio v. Georgia,* 127 F.Supp.2d 1274, 1298 (N.D.Ga.2001), *affirmed* by *DeJulio,* 290 F.3d at 1291. "The Equal Protection Clause of the Fourteenth Amendment and the 'one person, one vote' principle does not limit a legislative body to functioning as a committee of the whole. It does not require a properly apportioned legislative body to distribute power and influence so that every legislator is as powerful and influential as every other member of the body." *Id.*

Our dissenting colleague argues that committee members are appointed and local delegations are elected, but there can be no dispute that both members of committees and local delegations are selected through a process that occurs after the

election of the legislators. *See* Dissenting Op. at 1331–32 ("Excluded from the rule would, therefore, be appointed officials, for they are not elected, and legislative, executive, and administrative committees and other intra-structural bodies, for officials are not elected to those bodies (although they may nevertheless be elected to a different body, *i.e.*, the legislature itself, and then 'appointed,' in a sense, to the other, *i.e.*, the legislative committee)."). In Alabama, the legislative committees and local delegations are all appointed in the same organizational session that occurs each quadrennium. Until that meeting, no such internal organization exists. Our dissenting colleague relies on dicta in *DeJulio* in which the Eleventh Circuit stated in passing that local delegations in Georgia were popularly elected under *Hadley* because legislators become members of the local delegation by virtue of their election to the legislative seat, but the Eleventh Circuit did not purport to decide a contested point about the selection of local delegations. *Cf. United States v. Kaley*, 579 F.3d 1246, 1253 n. 10 (11th Cir.2009) ("[D]icta is defined as those portions of an opinion that are not necessary to deciding the case then before us.") (internal quotation marks omitted). The Eleventh Circuit also did not explore the implications of that point with respect to other subparts of the legislature. The Eleventh Circuit instead rested its decision on the narrow point that local delegations do not perform the kind of governmental functions that trigger the requirement of one person, one vote. We see no logical distinction between the manner in which local delegations are created and the manner in which all legislative committees are created. If our dissenting colleague were correct that local delegations in Alabama are subject to the requirement of one person, one vote, we would also have to conclude that all legislative committees are subject to that requirement.

■ We decline to interpret the requirement of one person, one vote to prohibit the ordinary manner in which legislatures conduct business. The Equal Protection Clause is satisfied by the apportionment of the legislature in accordance with the requirement of one person, one vote. Intrastructural bodies, whether committees or local delegations, need not satisfy the same requirement. The Legislature is free to assign legislators from rural areas to a committee on agriculture and legislators from coastal areas to a committee on tourism without regard to concerns of apportionment. And the Legislature is free too to assign members with constituents in a certain county to the local delegation for that county without requiring that every member represent the same number of constituents in that county.

## III. CONCLUSION

On consideration of the motions, reply, and response (Docs. # 95, 106, 107, 108, 109) as well as supporting and opposing authority, it is **ORDERED** that the motion by the State defendants for a partial summary judgment as to the claim of partisan gerrymandering in count three of the amended complaint filed by the Black Caucus plaintiffs is **GRANTED**. We **DISMISS** the facial challenge under the Equal Protection Clause in count three of the amended complaint filed by the Black Caucus plaintiffs for lack of subject matter jurisdiction. The motion by the Black Caucus plaintiffs for reconsideration of our order denying their motion for a partial summary judgment as to count three of their amended complaint is **DENIED**. The motion by the Black Caucus plaintiffs for entry of a permanent injunction is **DENIED AS MOOT**.

THOMPSON, District Judge, concurring in part and dissenting in part:

I agree with the majority's disposition of the First Amendment partisan gerrymandering claim and with much of its reasoning in support of that disposition. As for the one-person, one-vote claim, while I agree that the issue of justiciability has been properly raised by the court, I respectfully disagree with the majority's dismissal of the claim on that ground. And, second, I respectfully disagree with the majority's reasoning on the merits.

## I. BACKGROUND

In Alabama, during each election for members of the State Legislature (the House of Representatives and Senate), when Alabamians cast a vote for a single legislative representative, they are actually electing one official who will serve in two capacities tied to the geographic locations from which they are elected. For one, the legislator will represent a particular district in the State Legislature as a whole. Second, the legislator, depending on the location of the district, will become a member of one or more "Local Delegations" (or, as they are sometimes called, "Legislative Delegations"), which are formally subdivisions of the Legislature charged with the origination of "local" laws generally affecting a single county alone. *See* Ala. Const. art. IV, § 110 (defining "general" and "local" laws). Although Alabama has created certain local bodies of county governance, such as county commissions, *see* 1975 Ala.Code. § 11–3–1, state law generally vests those bodies with very limited authority, if any at all, to legislate for the county. *Compare, e.g.,* Ala. Const. amend. 783 (affording the Baldwin County Commission comparatively broad, albeit still limited, legislative authority), *with, e.g.,* amend. 482 ("The Limestone county commission is hereby authorized ... to pro-vide for the disposal of dead farm animals, and the excavating of human graves.").

Rather, state law generally requires that local laws, no matter how purely local their character may be, must be enacted by the Legislature as a whole (and, for reasons unnecessary to discuss here, often as amendments to the State Constitution rather than as mere statutes). The Alabama Constitution has been amended hundreds of times with such laws addressing an enormous range of wholly local concerns, from the mundane to the very important. *Compare, e.g.,* Ala. Const. amend. 497 (authorizing prohibition of "the overgrowth of weeds and the storage and accumulation of junk, inoperable motor vehicles and other litter" in Jefferson County), *with, e.g.,* amend. 429 (authorizing governing authorities in Jefferson County to conduct a range of activities related to economic and industrial development).

Because the Alabama Legislature as a whole must address the varying interests across all of Alabama's 67 counties, it has created a system of Local Delegations to carry out the task efficiently. Each Alabama county has a corresponding Local Delegation in both houses of the State Legislature. Every legislator elected to the Senate or House, upon his election, automatically becomes a member of the Local Delegation for every county that lies within his district, no matter how large or small is the part of the county falling within the district boundaries. If a legislator's district lies almost entirely in one county and only slightly in another, that legislator nevertheless joins the respective Local Delegations for both counties. Within any given delegation, all members cast equal votes regardless of the comparative sizes of their constituencies in the county at issue.

In order to be enacted eventually, all proposed local laws must be first proposed

by the Local Delegation for the county affected. Some Local Delegations require majority approval in the delegation and others require unanimous approval. Without the approval of the delegation for the county at issue, the bill proceeds no further. In that sense, the delegations are the "gatekeepers" of local legislation.

Once the delegation approves a local law, the bill is sent to a legislative committee.[1] After committee approval, the bill is sent to the Legislature as a whole. There, after approval by the requisite number of legislators in both chambers, the bill is sent to the governor for signature, after which it becomes binding law. When a proposed local law is being considered by the Legislature as a whole, the Legislature generally applies an unwritten rule of so-called "local courtesy" holding that the delegations deserve significant deference and their proposed laws should be enacted as a matter of course. While the rule of courtesy is sometimes violated, such violations are more the exception than the rule. In any event, regardless of what happens in the Legislature as a whole, the gatekeeping requirement that the bill be first approved by the applicable Local Delegation is steadfastly applied. There is no indication in the record that the gatekeeping requirement has ever been violated. In short, the Local Delegations, although subdivisions of the Legislature for the State as a whole, are geographically based on the State's individual counties and are the single most important legislating bodies for those counties.

The State Legislature is established by formal state law. Ala. Const. art. III, § 42 & art. IV, § 44. The Local Delegations, by contrast, are generally creatures of custom. The delegations' core local-law-gatekeeping function is not an enumerated power in any particular part of Alabama's Constitution or statutory law, and likewise, no written law provides for the whole of the delegations' operations. However, provisions scattered throughout the State Constitution and Code appear to recognize the existence of the delegations and control a number of aspects of their existence. *See, e.g.,* 1975 Ala.Code §§ 36–6–12 (relating to Local Delegation employee salaries), 36–27–5.1 (pensions), 45–22–130.02 (providing for Local Delegation involvement in certain intra-governmental disputes), 45–24–210 (providing for certain Local Delegation funding), and 45–27A–60 (relating to town trust account). In particular, a number of Constitution and Code provisions appear to afford various Local Delegations the power to appoint officers of various other governmental agencies. *See, e.g.,* 1975 Ala.Code §§ 9–14C–3 (park commission), 45–2–243.22 (tourism board), 45–5–90 (economic development authority), 45–6–231 (prison work-release program regulatory board), 45–8–90 (economic development authority), 45–8–150.02 (bingo regulatory agency), 45–8A–24 (water and sewage board), 45–8A–130.04 (civil service board), 45–25–92.30 (economic development authority), 45–28–91.01 (tourism board), 45–28–244.01(d) (taxing agency), 45–28–244.01(e) (library committee), and 45–30–101.01 (board of education); Ala. Const. amend. 677 (water and sewage board), amend. 741 (judicial commission), and 780 (judicial commission).

---

1. Both the Alabama House and Senate have a handful of legislative committees dedicated to local legislation, and those committees divide up the State's counties among them. A few committees take up local legislation from a single large county alone. In those cases, the membership of the delegation and the committee is identical and the delegation and the committee are, for all intents and purposes, one and the same. Most Local Delegations send their bills to committees that are responsible for reviewing the proposed laws from a large number of smaller counties.

While the Local Delegations are formally part of the Legislature as a whole and are generally maintained through unwritten custom, one would be mistaken to assume that they are nothing more than amorphous practices that can be found in the halls of Montgomery's legislative buildings. While the delegations differ, at least some appear to maintain local office space and regular paid staff, like any typical governmental agency that serves the public in a defined geographic region. *See, e.g.*, 1975 Ala.Code §§ 45-2-190 ("There is hereby established the Baldwin County Legislative Office. The County Commission of Baldwin County shall provide office space, office furniture, office equipment, telephone service, and accommodation for the members of the legislative delegation from the county. The personnel for the legislative delegation office shall be selected by the members of the legislative delegation . . . ."), 45-6-190 (similar, for Macon and Bullock counties), 45-24-190 (similar, for Dallas County), 45-27-190 (similar, for Escambia County), and 45-29-190 (similar, for Fayette and Lamar counties).

This Local Delegations system has existed in some form for decades at least, if not since the enactment of the 1901 State Constitution. It is, in short, the mostly unwritten law of county governance in Alabama.

## II. JUSTICIABILITY

The plaintiffs' one-person, one-vote claim contends, essentially, that Alabama's Local Delegations system causes unconstitutional discrimination as to voters' representation in government because all Local Delegation members have equal powers in the delegation while representing disproportionate numbers of voters in the county at issue, and members often representing constituencies outside the county as well. They base their claim not on the legislative districts currently in place, which are set to expire soon, but rather on the redistricting plans that have already been enacted and will be in effect for the next election, and under which, the plaintiffs allege, the State divides an excessive and unprecedented number of counties among multiple legislative districts. The county splitting is relevant, the plaintiffs explain, because now, more than ever before, more Local Delegation members will represent larger out-of-county interests over and to the detriment of smaller in-county interests, thus diluting the ability of a county's residents to affect their county's affairs. In essence, the plaintiffs seek to have greater local control over local affairs than the State's redistricting plans provide. In response, the majority says that Alabama's next Legislature may choose to abandon entirely or alter materially the whole Local Delegations system, and therefore, the voter inequality feared by the plaintiffs would never come to be. That possibility, the majority concludes, means that the claim should be dismissed on grounds of ripeness and standing.

### A.

As for ripeness, the majority states correctly the general proposition that, "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Ante,* at 1297 (quoting *Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998)). The majority, however, fails to apply that principle properly. The mere existence of any future contingency is not enough to render a claim unripe. If it were, litigants would never be able to assert claims seeking to enjoin future injurious conduct, as there is always at least a mere theoretical possibility that circumstances between now and then could somehow change so as to stave off the injury. *See Doe v. Bush,* 323 F.3d

133, 138 n. 4 (1st Cir.2003) ("[The defendants' argument] would seem to say that a case cannot be ripe on the basis of reasonably predictable future injury. This is not the law. The doctrine of ripeness asks whether an injury that has not yet happened is sufficiently likely to happen to warrant judicial review.") (punctuation and citation omitted).

Rather, when the plaintiffs' feared injury is contingent on future events, to determine whether the claim creates ripeness concerns, "a court must assess the *likelihood* that a contingent event will deprive the plaintiff of an injury. In other words, it is not merely the existence, but the '*degree* of contingency that is an important barometer of ripeness.'" *Mulhall v. UNITE HERE Local 355,* 618 F.3d 1279, 1291–92 (11th Cir.2010) (emphasis in original) (quoting *Riva v. Massachusetts,* 61 F.3d 1003, 1011 (1st Cir.1995)); *see also Riva,* 61 F.3d at 1011 ("[A] litigant seeking shelter behind a ripeness defense must demonstrate more than a theoretical possibility that harm may be averted."); *Martin Tractor Co. v. Fed. Election Comm'n,* 627 F.2d 375, 379 (D.C.Cir.1980) ("If the injury be a future one, the occurrence of the injury must be reasonably certain and clearly describable for the action to be deemed 'ripe' for adjudication.").

The majority ignores this degree-of-likelihood inquiry, explaining that the inquiry is relevant only where a future contingency may "*deprive* the plaintiff of an injury" that is already felt; not where an inchoate injury is dependent on a future contingency (and thus, the question is whether the injury "will occur at all"). *Ante,* at 1299. That distinction is not supported by any case law (the majority cites none, nor can it) and is not logically consonant with the central purpose of the ripeness doctrine: to protect courts "from engaging in speculation or wasting their resources through

the review of potential or abstract disputes." *E.g., United States v. Rivera,* 613 F.3d 1046, 1050 (11th Cir.2010).

In cases where the plaintiffs' feared injury is contingent on substantially uncertain future events, courts cannot reliably apply legal principles to the facts at hand, facts which may be hazy, changing, or otherwise amorphous, to determine whether or not there is or will be an actual violation of legal right. *See, e.g., Elend v. Basham,* 471 F.3d 1199, 1211 (11th Cir. 2006) (holding a First Amendment claim involving the right to protest unripe where the "analysis depends so critically on the location and circumstances of the protest zone" and "we don't know when [the plaintiffs] will protest, we don't know where they will protest, and we don't know how they will protest"); *Johnson v. Sikes,* 730 F.2d 644, 649 (11th Cir.1984) (holding a claim unripe so as to avoid "render[ing] an opinion advising what the law would be on an assumed set of facts"). There, the circumstances are, in short, "not fit for adjudication." *Texas,* 523 U.S. at 300, 118 S.Ct. 1257. By contrast, in cases where it is anticipated that the injury will be caused by future events that are sufficiently certain and the relevant contours sufficiently delineated, the facts are concrete enough to be amenable to application of law; and, there, the court should discharge its duty of declaring legal rights. *See, e.g., Riva,* 61 F.3d at 1011–13 (holding ripe a challenge to a statute anticipated to cause future injury: "The paramount harm to [the plaintiff]—the eventual reduction in his benefits—is distant in time, but its incidence seems highly probable." "There is no basis to suppose that any adjudication will be hampered by factual uncertainty.... The retirement scheme must now face judicial scrutiny."). A central goal of the ripeness doctrine is to separate those cases amenable to legal analysis from those that are not, and, thus, when legal

claims involve future events, it is critical to assess the likelihood of those events occurring as anticipated. *Cf. Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289, 297, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) ("The difference between an abstract question and a 'case or controversy' is one of degree, of course.").

Properly understood, the ripeness inquiry this court faces is whether it is sufficiently likely that the State will carry out the anticipated conduct that the plaintiffs contend will cause unconstitutional vote dilution: that is, one, conducting an election for members of the Legislature and the Local Delegations in accordance with the already enacted redistricting plans, and, two, continuing the operation of the State's longstanding Local Delegations system. As there is no doubt that the election will occur along the lines drawn by the redistricting plans, the only remaining question is whether it is sufficiently likely that the Local Delegations system will continue to operate in the same manner it has for decades. If the court agrees that the system will probably continue as the plaintiffs expect (that is, how it has historically operated), then all relevant facts are sufficiently concrete for the application of bedrock one-person, one-vote principles. And here, based on the evidence in the record, it is apparent that the actual likelihood of the State abandoning or materially altering the longstanding system is essentially nonexistent. The record shows as follows:

First, there is the fact that the Local Delegations system at issue in this case is not some hypothetical future legislative innovation, but rather, "the parties appear to agree that the local delegations system has been adopted by every Alabama Legislature for decades." Order (Doc. No. 130) at 4. In addition to the parties agreeing that the system is decades old, the evidence in the record is corroborative. According to

the Clerk of the Alabama House, who has worked for the House for over 20 years, the system has been in place the entire time. Likewise, the Secretary of the Alabama Senate, who has worked for or with the Legislature for 40 years, agreed with respect to his tenure. Also corroborative are published judicial decisions discussing or at least mentioning a Local Delegations system of some sort from years past, one from as far back as 1936. *See Hardy v. Wallace,* 603 F.Supp. 174, 176–77 (N.D.Ala.1985) (three-judge court); *Buskey v. Oliver,* 565 F.Supp. 1473, 1476–77 (M.D.Ala.1983) (Thompson, J.); *Birmingham–Jefferson Civic Ctr. Auth. v. Hoadley,* 414 So.2d 895, 906 (Ala.1982) (Maddox, J., dissenting); *Bolden v. City of Mobile,* 423 F.Supp. 384, 397 (S.D.Ala.1976) (Pittman, J.); *Brown v. Moore,* 428 F.Supp. 1123, 1138 (S.D.Ala.1976) (Pittman, J.); *Ala. State Teachers Ass'n v. Lowndes Cnty. Bd. of Educ.,* 289 F.Supp. 300, 311 (M.D.Ala.1968) (three-judge court); *Yeilding v. State ex rel. Wilkinson,* 232 Ala. 292, 167 So. 580, 593 (Ala.1936) (Brown, J., dissenting).

Second, the record also shows that, not only has the system been in place for decades, but also the system's procedural rules have not changed materially throughout that time. According to the House Clerk, the "local legislation rules" have been "fairly consistent" or "a constant" throughout his tenure. Woodard Dep. (Doc. No. 132–1) at 11:13–12:2. Specifically, he stated that the rule that a legislator join the delegations for all counties in his district in any small part, no matter how small (the key issue at the center of this litigation), had not changed "since [he had] been involved" with the House. *Id.* at 15:22–16:6. The Senate Secretary's testimony was similar: for "as long as [he could] remember," the "rules regarding local legislation [had] changed very little." Harris Dep. (Doc. No. 132–2) at 6:10–21.

Also in the record is an affidavit of a legislator and Local Delegation member describing the system's rules, and, although he does not explicitly say so, it is apparent from the context that he believes that those same rules will be in effect during the next legislative session. *See* Newton Decl. (Doc. No. 35–9).

Third, because we are dealing with probabilistic predictions, the gaps in the evidence are just as relevant as the evidence in the record; and here, the evidentiary gaps are telling. For one, there has been no testimony of anyone who remembers any time when either house of the Alabama Legislature actually chose to abolish or materially alter the system, to take any steps in that direction, or to even consider doing so. And, there has been no testimony of anyone in this case, not the House Clerk, Senate Secretary, defendant legislators, plaintiff legislators, or anyone else, that they think it likely, or even reasonably plausible, that the system will be abolished or materially altered at any time in the foreseeable future. And, there is no indication in the record that any legislator, or even any member of the public who intends to seek office as a legislator, has expressed a desire to abolish or materially alter the system. In short, there is no evidence in the record that anyone has ever before attempted to eliminate the Local Delegations, or that anyone intends to do so in the future.

Indeed, even the plaintiffs in this case have represented that they desire for the system to remain in place in some form. To the extent that the majority seems to believe that the plaintiffs seek to eliminate the system, the majority wholly misconceives what this litigation is about. While the system as used with the challenged redistricting plans will allegedly cause unnecessary and unconstitutional vote dilution, the complete elimination of the Local Delegations system, which provides at least some measure of local control, would be worse. "[G]iven the absence of home rule powers for counties in the Alabama Constitution, eliminating the ability of legislators to control local laws affecting the county they represent would further dilute the ability of county residents to govern themselves and would subject them to tighter control by central state government in Montgomery." Pls.' Br. (Doc. No. 133) at 5. In short, the basic goal of this litigation is to increase local control over local affairs, and the elimination of the Local Delegations system, if not replaced with something else that provides for comparable local control, would have the precise opposite effect. Moreover, it would have a racial dimension that would raise serious concerns under the Voting Rights Act, as it would have the effect of transferring power away from the black legislators who represent the majority-black counties and to the white majority of the State as a whole. "Doing away with the Local Delegations custom ... would impair 'the way blacks are gaining true political power in Alabama.'" *Id.* at 6. *Compare Hardy v. Wallace,* 603 F.Supp. 174, 175–77 (N.D.Ala.1985) (three-judge court) (after it became clear that the majority-black Greene County was going to soon elect its first black legislators, the outgoing white Local Delegation amended a statute affording the delegation the power to make certain agency appointments to instead give the appointment power to Governor Wallace); *see also* Binny Miller, *Who Shall Rule and Govern? Local Legislative Delegations, Racial Politics, and the Voting Rights Act,* 102 Yale L.J. 105, 115 (1992) (discussing *Hardy* and contending that its facts "powerfully demonstrate [that] legislative delegations have often been the objects of intense racial maneuvering aimed

at undercutting their authority").[2]

Fourth, the majority states that the next Legislature may abandon or materially alter the Local Delegations system during the next organizational session required by § 48.01 of the Alabama Constitution, but it is not clear whether doing so would even be lawful, as § 48.01 enumerates the "[only] business [that] can be transacted at such sessions" and it does not specifically mention Local Delegations at all. *See* Ala. Const. art. IV, § 48.01. As such, there seems to be a real question as to whether abolishing or altering the system during an organizational session would in fact violate § 48.01. *See generally Van Hart v. deGraffenried*, 388 So.2d 1196, 1199 (Ala. 1980) (discussing the actions that may constitutionally be taken in organizational sessions). The question seems to have never been faced because, as mentioned, it appears that the Legislature has never once actually attempted to abolish the Local Delegations system during an organizational session. And, while the majority has concluded that the rules adopted by the Alabama House and Senate at the

organizational session control whether and to what extent the delegations will have "gatekeeping" power over local laws, in fact the current rules of the current Legislature do not anywhere mention Local Delegations even though, as all agree, the current Legislature unquestionably uses the Local Delegations system.[3] The fair inference is that the Local Delegations system is separate and apart from the rules drafted in the organizational sessions.[4]

Fifth, the majority's analysis does not include the fact that aspects of the Local Delegations system are enshrined in written law: as already mentioned, scattered provisions of the Alabama Constitution and Code appears to provide for the Local Delegations to have certain specified powers, office space, employees with salaries and pensions, and more. As the State Constitution recognizes and controls the existence of Local Delegations in certain respects, there is a state-law issue as to whether the next Legislature could constitutionally eliminate the delegations without

---

**2.** In fact, reported cases suggest that Alabama's preference for centralized, rather than local, control embedded in the State Constitution to some extent is rooted in racist motives at the 1901 convention. It is well known that "the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks." *Hunter v. Underwood*, 471 U.S. 222, 229, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) (citations omitted). "[Z]eal for white supremacy ran rampant at the convention." *Id.* One district court found that the 1901 Constitution's hostility to county home rule was "motivated at least in part by race.... [It was] important not to have too much power in the hands of the counties, or to make sure that the power ... that is at the local level [was] in safe, that is, Democratic and white hands." *Knight v. Alabama*, 458 F.Supp.2d 1273, 1284–85 (N.D.Ala.2004) (Murphy, J.) (punctuation and citation omitted); *see also Dillard v. Crenshaw Cnty.*, 640 F.Supp. 1347, 1357–58 (M.D.Ala.1986) (Thompson, J.) (discussing ef-

forts to keep political power out of the hands of black voters in the heavily black counties by favoring centralized over local authority).

**3.** *See* Rules, Alabama State Senate, *available at* http://www.legislature.state.al.us/senate/senaterules/senaterulesindex.html (last visited July 11, 2013); Rules, Alabama State House of Representatives, *available at* http://www.legislature.state.al.us/house/houserules/houserulesindex.html (last visited July 11, 2013).

**4.** Additionally, there may be evidence in the record that the Alabama Legislature may not attach the same importance to remaking itself anew each organizational session that the majority seems to imply it does: the House Clerk wanted to "[m]ake clear" during his deposition that the House is "supposed to" adopt rules during its organizational session, but "[i]t doesn't always happen." Woodard Dep. (Doc. No. 132–1) at 17:9–13.

first repealing these constitutional provisions that presuppose their existence. And the same issue would seem to be present with respect to the Alabama Code, which also appears to presuppose the delegations' existence in numerous places. While it is theoretically possible, of course, that the Legislature could lawfully eliminate the Local Delegations one way or another despite their being recognized and controlled by provisions of the State Constitution and Code, we should be hesitant to find it likely that the next Legislature will do so, especially here, where not one single legislator is on the record as indicating any intent in this regard.

Viewing this evidence in the light most favorable to the plaintiffs, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), or viewing the evidence without favor to either side, the conclusion is obvious: The evidence overwhelmingly indicates that the Local Delegations system will almost certainly continue to exist with Alabama's next Legislature and the material aspects of the delegations will be the same as they are today, the same as they were last century, the century before that, and as far back as anybody involved in this litigation knows. This case, in short, bears out the maxim that the past is prologue to the future. The record simply contains no good reason to think that the next Legislature may

abandon the delegations, which appears to have never happened before, never been attempted before, and is not something anybody actually wants. "[A] litigant seeking shelter behind a ripeness defense must demonstrate more than a theoretical possibility that harm may be averted," and that, the State has not done. *See Riva*, 61 F.3d at 1011.[5]

While the majority states unequivocally that, "The rules for local legislation, including the use of local delegations, are adopted in the organizational session," *ante*, at 1291, I do not read the sources on which the majority relies, the Alabama House Clerk's and Senate Secretary's depositions, to say that. Indeed, both persons testified that legislative rules *are* adopted in the organizational session, but as already mentioned, those rules say *nothing* about whether the State will have Local Delegations or what powers those delegations will have. *See supra*, note 3. The majority leaps from "during the organizational session, the Legislature enacts rules" to "during the organizational session, the Legislature enacts the rules that sub silentio determine whether Local Delegations exist," but I do not see how that leap is supported by anything the House Clerk or Senate Secretary actually said. And, more importantly, the leap seems to be in contradiction of all the formal law providing that the Local Delegations "shall" exercise certain powers, *e.g.*, Ala. Const. amend. 677, they "shall"

**5.** The majority cites evidence of a 1999 episode in which a Democratic-controlled Alabama Senate revised its rules to "dramatically reduce" the Republican Lieutenant Governor's powers and argues that, since the Legislature made such changes then, it may make comparable changes again, say, maybe this time by eliminating the Local Delegations system. *See ante*, at 1301. I find it quite telling that the example of a past change to legislative procedures is one so dramatic and

unique. That this 1999 change is put forward as comparable in likelihood to a change in the Local Delegations system shows just how unlikely a change in the system is for the next session. In any event, the singular, 1999 episode can hardly outweigh the evidence that Local Delegations have been used for decades, nobody has ever attempted to eliminate them, and nobody has indicated a desire to do so in the future.

have offices, *e.g.*, 1975 Ala.Code § 45–2–190, their employees "shall" have pensions, *e.g.*, Ala.Code § 36–27–5.1, etc.

As the Local Delegations continue to exist in Alabama in fact and in law, as recognized by a number of statutes, constitutional provisions, and decades of custom, and there is no reason to think that that existence will cease, the alleged harm the delegations' malapportionment will cause in the imminent future is ripe for review. *Cf. Glavin v. Clinton,* 19 F.Supp.2d 543, 547 (E.D.Va.1998) (three-judge court) ("Defendants suggest that the case is not ripe because 'Congress has not reached its ultimate legislative conclusion regarding a sampling census.' Although it is certainly possible that Congress may seek to prevent the Department from conducting its plan to utilize sampling, there is no legal significance to this observation. Congress may always moot out a controversy by passing new legislation, but that fact does not shield agency action from judicial review. There is always the possibility that settlement or some external event will render a case moot, but that hardly renders the litigation nonjusticiable before that event occurs."), *aff'd sub nom. Dep't of Commerce v. House of Representatives,* 525 U.S. 316, 329, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999) ("[T]he District Court below correctly found that the case is ripe for review, and that determination is not challenged here."). Unless and until the State actually elects to eliminate the Local Delegations, they, like all other local bodies of government, are subject to judicial review. *See Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents,* 633 F.3d 1297, 1309–10 (11th Cir.2011) (once a governmental defendant's challenged conduct voluntarily ceases, the defendant "enjoy[s] a rebuttable presumption that the objectionable behavior will not recur" and, if not rebutted, the case is moot).

## B.

As for standing, as an initial matter, it cannot be questioned that the plaintiffs' asserted vote-dilution injury is a judicially cognizable one. *See Fairley v. Patterson,* 493 F.2d 598, 603 (5th Cir.1974) ("[T]he Supreme Court has conclusively established ... that sufficient damage through underrepresentation to obtain standing will be inflicted if population equality among voting units is not present.") (citations omitted). Once again, the only question here is whether that injury will actually come to pass. While the majority states correctly that there is no standing if the injury is merely "conjectural or hypothetical," *ante,* at 1300 (quoting *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130), it is also true that "there is no per se rule denying standing to prevent probabilistic injuries." *Fla. State Conference of N.A.A.C.P. v. Browning,* 522 F.3d 1153, 1162 (11th Cir.2008); *see also id.* ("[W]e have repeatedly upheld plaintiffs' standing when the alleged injury was prospective and probabilistic in nature."). Put another way, "[i]njury sufficient to meet the standing requirement ... may involve a contingent risk of injury." *Ore. Envtl. Council v. Kunzman,* 817 F.2d 484, 491–492 (9th Cir.1987). In such cases, whether the contingent risk of injury is sufficient to support standing turns on whether the plaintiffs are "likely" to suffer the injury feared. *City of Los Angeles v. Lyons,* 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Cone Corp. v. Fla. Dep't of Transp.,* 921 F.2d 1190, 1205 (11th Cir.1991) (aggregating cases and concluding, "[i]n sum, a plaintiff seeking declaratory and injunctive relief [must] show[ ] that the defendant is likely to injure the plaintiff"); *cf. Va. State Corp. Comm'n v. F.E.R.C.,* 468 F.3d 845, 848 (D.C.Cir.2006) (requiring a "substantial probability"). The degree of probability

required to support standing is "unde-manding." *Fla. State Conference of N.A.A.C.P.*, 522 F.3d at 1163; *see also Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin.*, 903 F.2d 445, 451 (7th Cir.1990) (although the likelihood of the alleged injury occurring was "thin gru-el, it [was] no thinner than" other cases finding standing). Based on the evidence already discussed and viewing that evi-dence in the light most favorable to the plaintiffs, it is clear that a sufficient likeli-hood of injury to support standing has been shown here. *See also Arrington v. Elections Bd.*, 173 F.Supp.2d 856, 861–62 (E.D.Wis.2001) (three-judge court) ("To achieve standing, all one needs to do is allege a 'threat' that one's voting rights may be diluted.... [Here,] the plaintiffs have met the 'relatively modest' burden of alleging a realistic threat of imminent in-jury to their voting rights.").

The next element of standing is causa-tion. The majority concludes that there is none here because it is the Local Delega-tions system's procedural rules, not the redistricting maps that the plaintiffs seek to enjoin, that causes the vote-dilution in-jury. That argument misconceives the na-ture of the injury. In all one-person, one-vote cases, the unconstitutional vote dilu-tion is brought about by two factors acting in conjunction, one, that elected officials represent disproportionate numbers of vot-ers, and two, that those officials exercise equal power despite having unequal con-stituencies. *Cf. Roxbury Taxpayers Alli-ance v. Delaware Cnty. Bd. of Supervisors*, 80 F.3d 42, 49 (2d Cir.1996) (declining to find a one-person, one-vote violation be-cause, even though the districts were not equipopulous, the legislators were afforded weighted votes in accordance with their respective constituency sizes); *Thigpen v. Meyers*, 231 F.Supp. 938, 941 (W.D.Wash. 1964) (three-judge court) (ordering weight-ed voting, rather than redistricting, to remedy a one-person, one-vote violation). The injury alleged in this case is caused by the redistricting plans as much as it is by the rules affording all Local Delegation members equal power.

Likewise, the injury is redressable for purposes of standing. It cannot be ques-tioned that a redistricting remedy by itself could remedy the one-person, one-vote vio-lation in at least some Local Delegations. Given the tension between the State's com-peting one-person, one-vote obligations vis-a-vis the Local Delegations and the Legis-lature as a whole (since one individual serves in both capacities), redistricting alone could probably not, without some additional other sort of remedy, eliminate the violation in all Local Delegations across the full length of the State. But, that fact does not defeat standing. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 526, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) ("[The risk of global warming causing harm] would be reduced to some extent if petitioners received the relief they seek."); *Chiles v. United States*, 69 F.3d 1094, 1096 (11th Cir.1995) (Florida had standing to pursue claims that the U.S. Attorney Gen-eral was unlawfully failing to stem the tide of illegal immigration because, even though "illegal immigration is dependent on many other factors outside the control of the Attorney General," the court "could offer some relief to Florida").[6]

---

6. The majority's argument that "one person, one vote is not the sort of injury that can be redressed by partial compliance," *ante*, at 1303–04, forgets that the standing doctrine itself often precludes plaintiffs from challeng-ing the full makeup of a governmental body and rather limits the legal challenge to dis-crete districts. *See, e.g., United States v. Hays*, 515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). Despite the majority's dicta with-out citation to authority, there never has been

Even if the majority is correct that this court could not order any of the named defendants to remedy the full extent of the one-person, one-vote violation across the entirety of the State, that does not defeat standing; it is enough that, one, the court's decree would alter legal duties such that the injury would be remedied in part (that is, in some Local Delegations), and two, "the practical consequences" of the decree would be "a significant increase in the likelihood that" the injury would be remedied in full (that is, in all Local Delegations across the State). *Utah v. Evans,* 536 U.S. 452, 464, 122 S.Ct. 2191, 153 L.Ed.2d 453 (2002) (finding an injury redressable even though the President, who had ultimate power over whether the injury would continue, was not a named defendant and would not be bound by any decree issued by the court, but would nevertheless likely honor the judiciary's judgment); *see also Duke Power Co. v. Carolina Envtl. Study Grp.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (finding an injury redressable when the injury was caused by a third party, not the defendants against whom the desired decree would run, because of the possibility of the third party reacting voluntarily to the decree so as to cease injurious conduct). If this court were to declare Alabama's Local Delegations system to violate constitutional requisites, it is substantially likely that State officials, even those not formally bound by this court's decree, would take the message to heart, and it is plainly apparent that the State could, should it desire, eliminate the violation in full through any number of procedural de-

vices, whether having weighted voting in the Local Delegations, having different persons serve in the Local Delegations and the Legislature as a whole, or otherwise.[7]

In sum, the vote-dilution injury alleged by the plaintiffs is both likely and redressable, and the plaintiffs have standing to seek that redress.

### C.

While the State may currently feel discontent over the existing degree of federal judicial involvement in its redistricting, I fear that the majority's ripeness and standing analysis may unintentionally sentence the State to a quagmire of perpetual litigation much greater than that occurring now. Suppose the plaintiffs wait until after the election to challenge the State's redistricting plans as they relate to the Local Delegations (as the majority says they must), and the court finds the case to have merit and orders remedial redistricting. Because each member of a Local Delegation is also a member of the Legislature as a whole, the remedial redistricting may then invite a claim that, as a result of the attempt at remedying the Local Delegations violation, the redistricting plans now violate one-person, one-vote in the Legislature as a whole. If that claim has merit and a second round of remedial redistricting is required, the State may, once again, be open to a new round of litigation over the Local Delegation districts. This may proceed ad infinitum until the State succumbs to a drastic remedy, replacing the current system with

an "all-or-nothing" requirement in redistricting cases.

**7.** Indeed, the State has repeatedly argued throughout this litigation that the redistricting plans challenged in this case were the result of a good-faith attempt at complying with

principles of law explicated by a three-judge district court in Georgia, *Larios v. Cox,* 300 F.Supp.2d 1320 (N.D.Ga.2004) (three-judge court). While Alabama was, of course, not bound by the Georgia court's decree, it nevertheless claims to have put great effort into honoring it.

something entirely different. In short, I think the law not only allows this court to consider at the same time the redistricting plans as they relate to the Local Delegations and the Legislature as a whole, but furthermore, sound public policy prefers that this court do so.

### III. MERITS

#### A.

I now turn to the merits. The "one-person, one-vote" rule under the equal protection clause of the Fourteenth Amendment requires that "the vote of any citizen [be] approximately equal in weight to that of any other citizen in the State." *Reynolds v. Sims*, 377 U.S. 533, 579, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (holding that the Alabama Legislature as a whole must adhere to one-person, one-vote). While that principle was at first applied to state legislatures, it is now "beyond question" that, because "[t]he Equal Protection Clause reaches the exercise of state power however manifested, whether exercised directly or through subdivisions of the State," the one-person, one-vote rule applies with equal force to the State's subdivisions as well, including city, county, and other bodies of local government. *Avery v. Midland Cnty.*, 390 U.S. 474, 479–80, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); *see also Bd. of Estimate v. Morris*, 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989); *Hadley v. Junior College Dist.*, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970).

Where the State has, without rational justification, through its districting plans or other forms of state action, created preferred classes of citizens who cast votes of a greater weight than others, the State has denied the equal protection of the laws. *See Reynolds*, 377 U.S. at 563, 84 S.Ct. 1362 (the "right to vote" of "individual voters living in disfavored areas" "is simply not the same right to vote as that of those living in a favored part of the State"). "The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." *Moore v. Ogilvie*, 394 U.S. 814, 819, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969).

Here, Alabama's Local Delegations system creates clear differences of voting power among the State's citizens, and the "discrimination against those individual voters living in disfavored areas is easily demonstrable mathematically." *Reynolds*, 377 U.S. at 563, 84 S.Ct. 1362. The Local Delegations system results in several forms of discrimination among Alabamians and the legislators elected to serve their interests.

The first distinction is between Alabamians of a particular county. After discounting the out-of-county voters who have no interest in a foreign county's local affairs (but elect members to the county's Local Delegation anyways), there is a difference of voting power among any given county's residents with respect to their ability to select members of their own Local Delegation. For example, in Jefferson County, the most populous county in Alabama, reside approximately 658,000 people. As explained, the Jefferson County Local Delegation's core function, legislating, and its lesser functions, such as agency appointments, relate to a single geographic region's population alone: the 658,000 residents of Jefferson County. However, under the challenged redistricting plans, those county residents will have dramatically different voices in the delegation charged with legislating in their interest. The Jefferson County Local Delegation in the House of Representatives will include the legislators from 18 districts (HD 14–16, 43–48, 51, 52, and 54–60). All of those districts will contain approximately 45,000 people each. Some of the dis-

tricts, however, will be made up of Jefferson County residents exclusively (that is, about 45,000 Jefferson County residents per district), while others will include large numbers of people residing in other counties as well. One district in the delegation, HD 43, for example, will include only 200 or so Jefferson County residents and about 44,800 neighboring Shelby County residents who, as residents of an area in which the Jefferson County Local Delegation exercises no powers, lack a legitimate interest in the delegation's affairs. It is apparent that, when selecting members of the Jefferson County Local Delegation, the 200 Jefferson County voters residing in HD 43, after discounting the 44,800 disinterested Shelby County voters, cast votes of far greater strength than do Jefferson County voters residing in any of the delegation's other districts "merely because of where they happen to reside" in the county. *Reynolds*, 377 U.S. at 563, 84 S.Ct. 1362. Those 200 voters exercise the same power over county affairs (a single vote on the Local Delegation) as do 45,000 others. In short, the Local Delegation "give[s] the same number of representatives to unequal numbers of constituents" in the county, *id.* at 563, 84 S.Ct. 1362, and that discrimination among county residents seeking to influence their county's affairs "is hostile to the one man, one vote basis of our representative government." *Moore*, 394 U.S. at 819, 89 S.Ct. 1493.

The second distinction is between legislators. Depending on whether a legislator's district lies entirely within a single county or instead crosses county lines, the legislator exercises differing powers in the Legislature: he has either the ability to serve as the "gatekeeper" of local laws for either a single county (if his district falls within a single county alone) or multiple counties (if his district touches multiple counties). As for Jefferson County, again,

some of the county's Local Delegation districts lie entirely within the county; the representatives of those districts will be able to legislate for Jefferson County and no other. By contrast, the representative of HD 43 will have equal ability to influence the affairs of both Jefferson County and Shelby County, even though only about 200 of the legislator's constituents will live in the former and about 44,800 will live in the latter. It is obvious that, in a political body like the State Legislature, where horse trading is a necessary part of business, affording some members greater powers than others is not without consequence. *Cf. Bannister v. Davis*, 263 F.Supp. 202, 209 (E.D.La.1966) (three-judge court) ("[A] representative does more than simply vote for legislation. He [also] exerts personal influence on other representatives...."). The HD 43 representative, who will legislate for both Jefferson and Shelby counties, simply does not stand on an equal footing with a representative empowered to legislate for Jefferson County alone; the former is empowered to influence legislation affecting the latter's constituents, but the latter lacks a corresponding power. And, of course, that power differential is not a result of political acumen, but is rather predetermined at the time of every election on the basis of nothing more than whether the legislator's district is in a favored or disfavored part of the State.

The third distinction is between the Alabamians who elect legislators to represent their interests. Because of the fact that some legislators are afforded greater legislative powers than others, it is, correspondingly, also the case that, within a particular area of the State, certain Alabamians may, through their representatives, influence the local legislative affairs of their neighbors in other counties, although those neighbors cannot do the

same for them. *Cf. Bd. of Estimate*, 489 U.S. at 698, 109 S.Ct. 1433 ("[A] citizen is shortchanged if he may vote for only one representative when citizens in a neighboring district, of equal population, vote for two.").

Consider the following example. Jefferson County has approximately 658,000 residents and neighboring Shelby County has approximately 195,000; together, the combined two-county area contains about 853,-000 people. Among those 853,000 people, about 45,000 of them, the residents of HD 43, will be able to, through their representative, exercise legislative power over themselves and all of their neighbors in both counties in the area; they will have a voice in the local affairs of all 853,000 people. Others, those residing slightly further down the road, in a district wholly in Jefferson County, will be able to legislate for about 658,000 people, the residents of Jefferson County alone. And, finally, a third group, those residing in a district wholly in Shelby County, will be able to legislate for about 195,000 people, the residents of Shelby County alone. There is simply no rational justification for the State affording the HD 43 voters such an amplified voice, giving them dominion over their neighbors who are not similarly empowered. In short, the Local Delegations system divides this community of about 853,000 people into classes, affording the "individual voters living in disfavored areas" a "right to vote [that] is simply not the same right to vote as that of those living in [the] favored [areas]." *Reynolds*, 377 U.S. at 563, 84 S.Ct. 1362; *see also id.* at 563–64, 84 S.Ct. 1362 ("To say that a vote is worth more in one district than in another would run counter to our fundamental ideas of democratic government.") (punctuation and citation omitted).

Although I have focused on Jefferson County and its neighbors, lest I be misunderstood, I emphasize here that such discrimination will exist across Alabama. In the challenged redistricting plans, 50 of the State's 67 counties are split among multiple legislative districts in the State House of Representatives and 33 are split in the State Senate, and this is far more county splits than had occurred in prior redistrictings. What I have described is found in each of those places.

While the three forms of discrimination already discussed are enough to show the constitutional infirmity in this case, there is a fourth, closely related, reason to think the State's legislative delegations scheme may be unconstitutional. That is, the State has given people (say, the HD 43 voters who reside in Shelby County) the power to influence a governmental body that they have no legitimate interest in (say, the Jefferson County Local Delegation), thereby diluting the votes of the legitimately interested voters. Although the Supreme Court has never directly addressed the matter, other courts have suggested that such circumstances are unconstitutional. *E.g., Cantwell v. Hudnut*, 566 F.2d 30, 36 (7th Cir.1977) ("Although there are no decisions on the point, we shall assume the correctness of the District Court's view that a state law allowing strangers to participate in the vote for representatives to a local legislative body having general governmental powers over a particular territory would offend the equal protection rights of the resident voters in that territory.").

Under the law of the Eleventh Circuit Court of Appeals, the State unconstitutionally violates the rights of voters with legitimate interests in a particular governmental body when the State extends the franchise to other persons lacking a "substantial interest." *Sutton v. Escambia Cnty. Bd. of Educ.*, 809 F.2d 770, 772 (11th Cir.1987) ("The test for whether the

statute is irrational as applied to the particular county is whether the city residents have a substantial interest in the operation of the county school system. If the city residents do not have a substantial interest, then the state must exclude the city residents from voting."). Other circuits have come to similar conclusions. *See Creel v. Freeman*, 531 F.2d 286, 288 (5th Cir.1976) (same); *Duncan v. Coffee Cnty.*, 69 F.3d 88, 94 (6th Cir.1995) (same); *cf. Locklear v. North Carolina State Bd. of Elections*, 514 F.2d 1152 (4th Cir.1975) ("compelling state interest").

Here, there has been no legitimate (let alone "substantial") interest proffered for Shelby County residents voting for the Jefferson County Local Delegation. (In fact, there is reason to think that residents of Shelby County may have adverse interests to those of the neighboring Jefferson County.) A quick look at the State's redistricting plans reveals that, across the State, residents of numerous counties are authorized, through their representatives, to legislate for other, neighboring, and, in many cases, even distant, counties. In the case of HD 16, residents of the rural Lamar County, which is on Alabama's western border with Mississippi, may legislate for the distant, comparatively urban, Jefferson County, the third county to the east, in the middle of the State. In the case of HD 68, Conecuh County residents may legislate for three-county-away Marengo County. There are too many other similar instances to list. (And of course, other voters, by contrast, do not extend such reach; in the case of HD 86, for example, the voters of Houston County may legislate for themselves alone.) It strains credulity to imagine that this hodgepodge of authorizing certain Alabamians to cast votes for "local" (a misleading term here) delegations that do not affect them and only affect faraway others is justified by legitimate state interests.

In fact, defendant State Representative Jim McClendon, who served on the State's legislative reapportionment committee that drew the redistricting plans challenged in this case, raised his own similar concerns in this regard at one of the committee's hearings: "I am now speaking as a representative of St. Clair County and not a member of this board.... I want to get this on the record on behalf of my home county. Right now we have six legislators from St. Clair County. Five of them do not live in St. Clair County. Five of them have a majority of their voters in some other counties. That affects accountability.... In St. Clair County, any one of those six legislators, whether they live in the county or not, can veto any local legislation.... [T]hat is not right." Legislative Reapportionment Comm. Hr'g Tr. (Doc. No. 30–26) at 7. The irrational scheme for enacting local legislation about which McClendon complains violates the constitutional rule of *Sutton* and related circuit court decisions.

In sum, Alabama has discriminated against certain of its citizens as to their opportunity for democratic participation merely because of where they live in the State and it has done so without any rational justification. That discrimination denies Alabamians the equal protection of the law.

### B.

As McClendon acknowledged, Alabama's scheme for enacting local legislation has obvious deleterious effects. The plaintiffs in this case allege that the most drastic instance of a Local Delegation failing to respond to the needs of its citizens can be found in Jefferson County. Based on the present record, it is impossible to determine whether the allegations about Jefferson County have merit, but, in the interest

of illustrating what may be at stake in this case, it is worth noting the contentions.

As the plaintiffs explained it, until recent years, Jefferson County collected an "occupational tax" from persons who resided outside the county and commuted in for business. The Alabama Supreme Court invalidated the tax for reasons unrelated to the issues in this case, thereby causing Jefferson County to lose a significant source of revenue. *See Jefferson Cnty. Comm'n v. Edwards*, 32 So.3d 572 (Ala. 2009); *Jefferson Cnty. v. Weissman*, 69 So.3d 827 (Ala.2011). Although it was clear that new revenue was needed, the county's Local Delegation, which, of course, included legislators whose primary constituencies were outside the county, failed to reenact the occupational tax (in a manner permissible under state law, that is) or to provide for any alternative. That failure was, as the bankruptcy court would describe it, a "major cause" of Jefferson County's subsequent bankruptcy, the largest governmental bankruptcy in American history at the time. *In re Jefferson Cnty.*, 484 B.R. 427, 434 (Bankr.N.D.Ala.2012) (Bennett, J.); *see also id.* at 436 ("All those who attribute Jefferson County's bankruptcy case . . . only to conduct and actions by the County are ill-informed. The State of Alabama and its legislators are a significant, precipitating cause."). According to a newspaper story in the record, a legislator from Shelby County credited legislators like herself, representing out-of-county interests, with averting reenactment of the occupational tax: "When you add up those people that represent counties surrounding Jefferson, that's a lot of folks. . . . They don't want their constituents to have to pay an occupational tax for Jefferson County." Barnett Wright, *Jefferson County Lawmakers to Meet, Try Again for Solution [to] County Financial Crisis,* The Birmingham News, April 22, 2012 (Doc. No. 35–4).

Whether the Jefferson County bankruptcy could have been avoided had the county been governed by a system that respected the rule of one-person, one-vote cannot be known but, as this court adjudges the constitutionality of Alabama's Local Delegations scheme, the possibility should be considered.[8]

### C.

For the foregoing reasons, I believe that Alabama's Local Delegations scheme, which irrationally empowers certain of the State's citizens to the disadvantage of others, violates the equal protection clause. The majority, however, in its alternative holding on the merits, erroneously decides otherwise because, as the majority explains it, the Local Delegations do not exercise "governmental functions."

### 1.

Like the majority, I begin my analysis regarding "governmental functions" with

---

8. Additionally, given the history of racism to some extent underlying the Local Delegations system's roots, *see supra,* note 2, and issues with racially discriminatory governance in this part of the State in the recent past, *see Shelby Cnty. v. Holder*, —— U.S. ——, 133 S.Ct. 2612, 2646–47, 186 L.Ed.2d 651 (2013) (Ginsburg, J., dissenting) (discussing *Dillard v. Crenshaw Cnty.*, 748 F.Supp. 819 (M.D.Ala. 1990) (Thompson, J.)), the appearance of the Local Delegation for Jefferson County, a black population center, being diluted by interests from Shelby County, an overwhelmingly white constituency, is troubling. Another county split may be even more questionable. In the case of HD 61, which is approximately 80% white, that district crosses into Greene County, which is approximately 80% black, to capture a mere 12 people. The effect is, a majority-white constituency can exercise a veto over a majority-black county's residents' wishes, all because a mere 12 people were placed in one district rather than another. Whether these circumstances are evidence of race discrimination, however, is a question for this court for another day.

*Hadley v. Junior College Dist.,* 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970). *Hadley* was decided in 1970, six years after *Reynolds,* which, for the first time, applied the one-person, one-vote rule to a state legislature. During the intervening six years between *Hadley* and *Reynolds,* there was uncertainty in the lower courts regarding the sorts of state governmental bodies besides legislatures, if any, to which the one-person, one-vote rule applied. For example, some courts distinguished between "legislative" and "administrative" bodies, assuming that the rule applied to the former but not the latter. *See, e.g., Hyden v. Baker,* 286 F.Supp. 475, 483 n. 13 (M.D.Tenn.1968) (three-judge court) (collecting cases).

In *Hadley,* the Court, addressing this confusion, repudiated distinctions based on the nature of a governmental body's functions, repeatedly eschewing the distinctions that were proposed to limit application of the one-person, one-vote rule: "When a court is asked to decide whether a State is required by the Constitution to give each qualified voter the same power in an election open to all, there is no discernible, valid reason why constitutional distinctions should be drawn on the basis of the purpose of the election.... While there are differences in the powers of different officials, the crucial consideration is the right of each qualified voter to participate on an equal footing in the election process." 397 U.S. at 54–55, 90 S.Ct. 791. The Court declined to recognize a distinction based on the "importance" of the governmental body. *Id.* at 55, 90 S.Ct. 791. It also declined to recognize a distinction based on whether governmental bodies exercised "legislative" or "administrative" functions. *Id.* at 55–56, 90 S.Ct. 791.

Immediately after having rejected these possible narrowing principles on the application of the one-person, one-vote rule, the Court announced its holding in the very next sentence:

"We therefore hold today that as a general rule, whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election, and when members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials."

*Id.* at 56, 90 S.Ct. 791.

This holding contains two essential teachings. The equal protection clause reaches "an elected body," first, whose "members ... are chosen from separate districts" and, second, which performs a "government function." If these two factors are present, the "district[s] must be established on the basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials," or to put it more succinctly, the one-person, one-vote rule applies.

As to the first teaching, the Court is essentially saying that the clause reaches multi-member bodies whose members are elected from separate districts. This, to me, is the quintessential entity to which the one-person, one-vote rule should apply. It should be emphasized that, *Hadley*'s language is quite narrowly confined to those circumstances where "a state or local government decides to select persons by popular election" to serve in the governmental body at issue (and, within that category, "when members of [a governmental] body are [elected] from separate districts"). *Id.* at 56, 90 S.Ct. 791. Ex-

cluded from the rule would, therefore, be appointed officials, for they are not elected, and legislative, executive, and administrative committees and other intra-structural bodies, for officials are not elected to those bodies (although they may nevertheless be elected to a different body, *i.e.*, the legislature itself, and then "appointed," in a sense, to the other, *i.e.*, the legislative committee).[9] *See Sailors v. Bd. of Educ.*, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967) (one-person, one-vote rule does not apply to appointed officials).

As to the second teaching, that the Court used the word "governmental," a word that literally reaches all aspects of what the government does, to modify the word "functions" reflects that the Court was emphasizing that the former word should be broadening rather than narrowing. This makes sense since, as the Court indicates, the nature of the bodies' functions is not the decisive factor, but rather, it is the structure of the means of selecting the body (that is, that members are selected by voters) that determines whether the requirements of one-person, one-vote are triggered. If the entity is a multi-member body whose members are elected from separate districts, it makes no difference whether its functions are administrative,

executive, legislative or whatever, as long as they are governmental. The Court could have used a more limiting modifier, such as by requiring "important," "plenary," or "final" functions, but it did not. *See Hadley*, 397 U.S. at 60, 90 S.Ct. 791 (Harlan, J., dissenting) ("[This] case forebodes, if indeed it does not decide, that the [one-person, one-vote] rule is to be applied to every elective public body, no matter what its nature."); *Twp. of Marlboro v. Bd. of Educ.*, 992 F.Supp. 756 (D.N.J.1998) (Wolin, J.) ("In essence, the Supreme Court held [in *Hadley* ] that all elections must comply with the 'one person, one vote' principle.").[10] The Court imposed no such limiting modifier, instead concluding simply that, "[w]hile there are differences in the powers of different officials," "there is no discernible, valid reason why constitutional distinctions should be drawn on [that] basis." *Hadley*, 397 U.S. at 55–56, 90 S.Ct. 791.

If *Hadley* itself is not enough to show that the one-person, one-vote rule is broadly applicable to multi-member bodies whose members are elected from separate districts, additional Supreme Court decisions should bolster that conclusion. The first case is *Board of Estimate v. Morris*,

9. The majority says that it "see[s] no logical distinction between the manner in which local delegations are created and the manner in which all legislative committees are created" because the members of both "are all appointed in the same organizational session that occurs each quadrennium." *Ante*, at 1314. The difference is obvious: even assuming that committee and Local Delegation "appointments" happen at the same time, the Local Delegations system assigns legislators to delegations "automatically" on the basis of geography, versus the committee system, in which legislators are appointed to committees based on political acumen. As for committees, even though not every legislator will ultimately serve on, say, the agriculture committee, all legislators have the opportunity to

seek to do so. In turn, all voters have the equal opportunity to influence the business of the agriculture committee.

10. In Chief Justice Burger's dissenting opinion criticizing the majority's holding, the Chief Justice restated the holding with a notable omission as follows: " '[A] general rule, (that) whenever a state or local government decides to select persons by popular election * * *,' the Constitution commands that each qualified voter must be given a vote which is equally weighted with the votes cast by all other electors." *Hadley*, 397 U.S. at 70, 90 S.Ct. 791 (Burger, C.J., dissenting). Apparently, the Chief Justice thought the "governmental functions" language was not important enough to warrant repeating.

489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989), where the Court held that the New York City "Board of Estimate" was subject to one-person, one-vote. There, the Court discussed a broad array of the board's functions, but it did so only insofar as those functions were relevant in determining that the board did, in fact, have some sort of "sufficient impact throughout the district" to invoke the requirements of one-person, one-vote. *Id.* at 696, 109 S.Ct. 1433 (quoting *Hadley,* 397 U.S. at 54, 90 S.Ct. 791).

Importantly, in a footnote in the Court's opinion, the Court, quoting from a party submission, listed the board's functions, dividing them between plenary functions that the board handled "exclusively" and non-plenary functions that the board handled "in conjunction with the New York City Council." *Id.* at 694 n. 4, 109 S.Ct. 1433. In the opinion's body text to which that footnote was appended, the Court, referring to these functions, stated simply that, "New York law assigns to the board a significant range of functions common to municipal governments." *Id.* at 694, 109 S.Ct. 1433. Again, the Court here had the opportunity to draw a distinction of constitutional significance based on the nature of those functions, but the Court did not do so. Moreover, in deciding that the board's functions were "governmental" ones invoking the one-person, one-vote rule, the Court did attach "major significance" to one of the board's non-plenary powers in particular: that is, that "the board shares legislative functions with the city council with respect to modifying and approving the city's capital and expense budgets." *Id.* at 696, 109 S.Ct. 1433. The board "recommend[ed]" a budget, but did not have plenary authority to enact its recommendation; rather, "[a]pproval or modification of the proposed budget require[d] agreement between the board and the city

council." *Id.* at 694 n. 4, 696, 109 S.Ct. 1433.

In short, *Board of Estimate* reflects that, as for the nature of a governmental body's functions, the relevant inquiry for determining whether those functions invoke the one-person, one-vote rule is whether those functions cause the body to have some sort of impact in the geographic area it serves, whatever that impact may be, and, furthermore, even non-plenary legislative functions may be highly significant in causing such an impact. So long as the threshold "impact" requirement is met, courts should not second guess whether, given the nature of the body's functions, the effect of the impact is felt strongly enough to warrant equal voting requirements. *See also Hadley,* 397 U.S. at 55, 90 S.Ct. 791 ("If the purpose of a particular election were to be the determining factor in deciding whether voters are entitled to equal voting power, courts would be faced with the difficult job of distinguishing between various elections. We cannot readily perceive judicially manageable standards to aid in such a task.... If there is any way of determining the importance of choosing a particular governmental official, we think the decision of a State to select that official by popular vote is a strong enough indication that the choice is an important one.").

In all its years of adjudicating one-person, one-vote cases since these decisions, the Supreme Court has recognized a single limitation on the one-person, one-vote rule's application to multi-member bodies whose members are elected from separate districts, the so-called "special-purpose" exception. The special-purpose exception was first invoked as a possibility in *Avery,* the first Court decision to apply the one-person, one-vote rule to a local governance body: "Were the Commissioners Court a special-purpose unit of government as-

signed the performance of functions affecting definable groups of constituents more than other constituents, we would have to confront the question whether such a body may be apportioned in ways which give greater influence to the citizens most affected by the organization's functions." 390 U.S. at 483–84, 88 S.Ct. 1114. Next, in *Hadley*, after announcing the general rule that the one-person, one-vote rule applies to all elected officials that "perform governmental functions" in defined geographic areas, the Court revisited the possibility although, again, did not apply it: "It is of course possible that there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups that a popular election in compliance with *Reynolds* [ ] might not be required." 397 U.S. at 56, 90 S.Ct. 791.

The exception, as described in those cases, is common sense. Although place of residence within a State is an irrational basis for discriminating as to voting power when electing members of the statewide legislature, a body charged with duties impacting all of the State's citizens, *Reynolds*, 377 U.S. at 563, 84 S.Ct. 1362, the special-purpose exception simply recognizes that, in other cases, where a governmental body's more narrow functions (that is, not "typical" governmental functions) disproportionately affect some citizens to a greater extent than others, it is entirely rational, perhaps even sensible, that those citizens disproportionately impacted exercise correspondingly disproportionate voting power in electing the members of that body.

The first of three Supreme Court cases to actually apply the exception was *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973). There, the Court concluded that, because the operations of a California "water storage district," distributing water and charging for it according to land ownership, affected citizens to varying degrees according to the amount of land they owned, the State may constitutionally weigh its citizens' votes accordingly to allow those most affected to have the loudest voice when electing members of the body. *Id.* at 729–30, 93 S.Ct. 1224; *see also Ball v. James*, 451 U.S. 355, 362, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981) ("[T]he question in this case [is] whether the purpose of the [governmental body at issue] is sufficiently specialized and narrow and whether its activities bear on landowners so disproportionately as to distinguish the [body] from those public entities whose more general governmental functions demand application of the *Reynolds* principle."); *Associated Enters., Inc. v. Toltec Watershed Improvement Dist.*, 410 U.S. 743, 744, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973) (similar).

Years later, in *Quinn v. Millsap*, 491 U.S. 95, 109 S.Ct. 2324, 105 L.Ed.2d 74 (1989), *rev'g* 757 S.W.2d 591 (Mo.1988), the Court revisited these special-purpose cases (albeit not in the context of one-person, one-vote). There, the Court reversed a Missouri state-court decision holding that the Missouri "Board of Freeholders" may constitutionally limit its membership to landowners. The state court, relying on the three special-purpose cases, read those decisions to stand for the principle that the equal protection clause applied to the board only if it had "general governmental powers." 757 S.W.2d at 594–95 (citing *Salyer, Associated Enters., Inc.*, and *Ball*). The board did not have such "general governmental powers," the state court held, because "[t]he Board of Freeholders serves only to recommend a plan of reorganization to the voters of St. Louis City and St. Louis County." *Id.* at 595. It could not, by itself, implement such a plan;

therefore, the state court concluded, "the Equal Protection Clause [had] no relevancy." *Id.*

The Supreme Court reversed because the state court's "ruling reflect[ed] a significant misreading of our precedents." *Quinn,* 491 U.S. at 96, 109 S.Ct. 2324. The Court explained, "In holding the board of freeholders exempt from the constraints of the Equal Protection Clause, the Missouri Supreme Court [ ] relied [in part] on the fact that the Board of Freeholders serves only to recommend a plan of reorganization to the voters of St. Louis City and St. Louis County and does not enact any laws of its own. But this fact cannot immunize the board of freeholders from equal protection scrutiny"; the special-purpose cases "do not support that conclusion." *Id.* at 104–05, 109 S.Ct. 2324 (punctuation omitted). Rather, in each of those special-purpose cases, "the Court expressly applied equal protection analysis and concluded that the voting qualifications at issue passed constitutional scrutiny." *Id.* at 105, 109 S.Ct. 2324. In short, regardless of whether a governmental body "enact[s] laws directly" or merely "recommends a proposal," that distinction does not allow the body to escape the ordinary equal-protection scrutiny, and the Court's special-purpose exception jurisprudence does not provide otherwise.

In sum, these decisions, read together, create the following framework. As an initial matter, the Fourteenth Amendment's equal protection clause reaches all governmental bodies regardless of what functions those bodies exercise or what purposes they serve (*Quinn*). Because all governmental bodies (state or local) are subject to equal-protection requirements, those bodies consisting of multiple members each elected from a discrete geographical district are subject to the one-person, one-vote rule (*e.g., Reynolds, Had-*

*ley*), unless there is a rational basis warranting otherwise (*Salyer, Associated Enterprises,* and *Ball*). If the body has a meaningful impact throughout the geographic region it serves, affording unequal votes on the basis of where within the region the voters happen to reside is irrational (*e.g., Reynolds, Hadley*). That is true regardless of whether the body is important, whether its functions are best characterized as administrative, legislative, or otherwise (*Hadley*), or whether its powers are plenary or are instead limited by some manner of checks and balances (*Board of Estimate*). Simply stated, so long as a governmental body is popularly elected in a defined geographic region and has some sort of meaningful presence across that region, it is subject to one-person, one-vote. In general, almost all governmental multi-member bodies whose members are elected from separate districts will meet that description because, in a democratic system like ours, where government is expected to respond to the people, it is a rare occasion when politicians are elected to do nothing. *Cf. Hadley,* 397 U.S. at 55, 90 S.Ct. 791 ("[I]n our country popular election has traditionally been the method followed when government by the people is most desired.").

The Supreme Court has recognized only these circumstances when it is rational, and thus constitutional, to give voters unequal votes: they are when the governmental body at issue does not sufficiently impact all persons in its defined geographic region, but, on the contrary, serves a narrow purpose that, one, affects only some and not others, or two, affects all, albeit disproportionately, and some persons have recognizably different stakes in the governmental body than others. *See Salyer,* 410 U.S. at 736–37, 93 S.Ct. 1224 (only landowners, not non-landowners, had stake in water district because there was "no way that the economic burden of dis-

trict operations [could] fall on residents qua residents, and the operations of the district primarily affect[ed] the land within [the district] boundaries"); *Associated Enters., Inc.,* 410 U.S. at 745, 93 S.Ct. 1237 ("landowners [were] primarily burdened and benefitted by the establishment and operation of watershed district" and thus, the "State could rationally" "condition the vote accordingly"); *Ball,* 451 U.S. at 370, 101 S.Ct. 1811 (while water district had some impact on non-landowners denied the franchise, the voting scheme was nevertheless constitutional because landowners, who had the franchise, had disproportionately high stakes in the body as they "[were] the only [persons] whose lands [were] subject to liens to secure [ ] bonds," were the only residents "subject to the . . . taxing power of the [body]," and "[were] the only residents who ha[d] ever committed capital to the [body] through stock assessments"). In those cases, it is rational to preclude from the franchise those not affected by the body or to otherwise tie the franchise to the degree to which persons are affected. There, the persons not affected cannot contend that they are being refused representation that should be fairly expected under principles of democratic governance. Whenever a governmental body that is popularly elected in a defined geographic area seeks to avoid the mandate of one-person, one-vote, the sole inquiry before the court is whether the body has such a narrow purpose and disproportionate effect and, if so, whether the voting scheme is rationally related to those circumstances. All other inquiries are without matter. *See Ball,* 451 U.S. at 377, 101 S.Ct. 1811 (White, J., dissenting) ("[N]othing in *Salyer* changed the relevant constitutional inquiry. Rather, the Court held the *Reynolds–Avery* [ ] line of cases inapplicable to the water district because of its 'special limited purpose' *and* the disproportionate effect of its activities on landowners as a group.") (emphasis in original).

Therefore, the initial critical question here is whether Alabama's Local Delegations are multi-member bodies whose members are elected from separate districts. That the answer to this question is yes is dictated not only by the facts in this case but also by Eleventh Circuit precedent. As stated, when Alabamians cast a vote for a single legislative representative, they are actually electing one official who will serve in two capacities tied to the geographic locations from which they are elected: for one, the legislator will represent a particular district in the State Legislature as a whole, and, second, the legislator, depending on the location of the district, will become a member of one or more Local Delegations. That one legislator is elected to two offices is of no consequence. *See Morris v. Bd. of Estimate,* 707 F.2d 686, 689 (2d Cir.1983) ("We are impelled to the realistic recognition that a citizen entering the voting booth chooses at one and the same time a member of the Board of Supervisors and his town supervisor." "The mere fact that board members may be characterized as 'delegates' and perform functions in addition to their duties on the board, does not provide a meaningful distinction.") (punctuation and citation omitted), *aff'd,* 489 U.S. 688, 694, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989) ("All eight officials become members as a matter of law upon their various elections."). Likewise, that the Local Delegations are mostly not maintained through written law is also without consequence. *See Nashville, C. & St. L. Ry. v. Browning,* 310 U.S. 362, 369, 60 S.Ct. 968, 84 L.Ed. 1254 (1940) ("It would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it. Set-

tled state practice ... can establish what is state law. The equal protection clause did not write an empty formalism into the Constitution. Deeply embedded traditional ways of carrying out state policy ... are often tougher and truer law than the dead words of the written text."); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 168, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (similar).

Moreover, Eleventh Circuit precedent addressing a Local Delegations scheme virtually identical to Alabama's likewise concluded that the delegations were multi-member bodies elected from separate districts. *See DeJulio v. Georgia*, 290 F.3d 1291, 1295 (11th Cir.) (holding that, with respect to Georgia's Local Delegations, *Hadley*'s requirement that officials be "elected" is "clearly satisfied" because, "[w]hen public officials become members of [the delegations] simply by virtue of their popular election to the legislature, they are deemed popularly elected [to the delegations] for the purposes of the one person, one vote requirement") (punctuation and citation omitted), *cert. denied*, 537 U.S. 948, 123 S.Ct. 413, 154 L.Ed.2d 293 (2002).

Thus, Alabama's Local Delegations are on a par with all other Alabama elected multi-member bodies, such as city governments, county commissions, school boards, regulatory boards, etc. whose members are elected from separate districts. And, it is quite clear from the delegations' powers that they have a meaningful and significant impact throughout the counties they serve. The second question is whether to treat the Local Delegations, multi-member bodies whose members are elected from separate districts, differently from other similar bodies. Absent some special circumstances justifying the refusal to afford equal voting power, Supreme Court precedent says no, and there are no such special circumstances with regard to Local Dele-

gations—or, at least, Alabama has not articulated any.

In stark contrast to that legal framework, the majority today decides that Alabama's Local Delegations are not subject to the one-person, one-vote rule because they do not perform "the kind of governmental functions" that invoke the rule. *Ante*, at 1309. Several paragraphs in particular in the majority's opinion demonstrate best the flaw in its reasoning. The first paragraph reads in part:

> "The local delegations in Alabama do not exercise general governmental powers or functions of the kind that the Supreme Court has identified as necessary to invoke the requirement of one person, one vote.... [L]ocal delegations cannot enact laws for the counties. Local legislation must be passed by a majority of the legislature and signed by the governor, or passed by a majority of the legislature over a governor's veto."

*Ante*, at 1311 (citations omitted). However, neither of the houses of the Alabama Legislature, acting alone, has these powers either. Each house alone, without approval from the other house, "cannot enact laws"; rather, laws "must be passed by a majority of the legislature [of both houses] and signed by the governor, or passed by a majority of the legislature [of both houses] over a governor's veto." In short, the State House of Representatives, the State Senate, and the Governor each play a role in the legislating process and none, acting alone, can "enact laws." And yet, elections for each of these are subject to the requirements of voter equality.

The majority goes on the say that:

> "[L]ocal delegations cannot enact laws for the counties.... Although the practice of local courtesy makes it likely that local legislation recommended by the local delegations will be passed by the Alabama Legislature, that likelihood de-

pends entirely on the will of the whole body, which need not continue or honor the practice of local courtesy. Because ... the power of lawmaking is reserved to the legislature as a whole, we cannot conclude that local delegations perform important governmental functions that are general enough and with sufficient impact to justify the extension of *Reynolds* to the election of local delegations."

*Ante*, at 1311 (punctuation and citation omitted). However, this language misses the point for two reasons. First, when the plaintiffs talk about a practice that is never breached, it is not the local courtesy rule (which comes into play after proposed legislation makes it out of the Local Delegation) that is at issue but rather the gatekeeper function (which allows local legislation to emerge from the Local Delegations to be considered by the Legislature, or prohibits such). But, second, and most importantly, it is not the nature of the governmental function alone that triggers the application of the one-person, one-vote rule, but rather it is, as discussed, the electoral structure.

The majority seems to suggest that, given that passage of local legislation requires at least two steps, initial approval by the delegation and then subsequent approval by the full legislature, so long as the second step satisfies the mandate of voter equality, then there is no harm caused by any inequality at the first step. *See ante,* at 1314 ("The Equal Protection Clause is satisfied by the apportionment of the legislature in accordance with the requirement of one person, one vote. Intrastructural bodies, [including] local delegations, need not satisfy the same requirement."). Put another way, even if there is inequality in the delegations, whatever harm that inequality causes is remedied at the second step, in the properly apportioned Legislature as a whole. That argument is without merit. As I have described, the Local Delegations are the sole bodies charged with beginning the local legislating process. If the delegations do not send a bill proposing a local law to the Legislature as a whole, the desired law will never be enacted.[11] As such, the harm caused by the inequality in the delegations has an obvious continuing effect that is not remedied in the legislature as a whole. *See Baker v. Reg'l High Sch. Dist. No. 5,* 520 F.2d 799, 802 (2d Cir.1975) ("While [the board's decision to borrow money] must be [subsequently] approved by the voters of the regional district in a referendum, it is or should be clear that this does not substantially undercut the significance of the boards' function.... While the voters have the final word, what they ratify or disapprove can be only what the board decides to present to them."); *cf. Avery,* 390 U.S. at 481, 88 S.Ct. 1114 ("That the state legislature may itself be properly apportioned does not exempt subdivisions from the Fourteenth Amendment.").

The next paragraph of the majority's opinion with which I find fault is as follows:

"[I]n *Ball,* the Court said more than in either *Salyer* or *Associated Enterprises.*

---

11. The majority repeatedly uses the word "recommend" to describe the legislative function of the delegations. *See, e.g., ante,* at 1311 ("As a matter of courtesy, local delegations review and recommend local legislation to the Alabama Legislature as a whole."). It should be emphasized here that use of the word "recommend" can be misleading insofar as it may imply that the Legislature itself is in the business of independently drafting local laws and the delegations merely suggest proposals for the Legislature to consider. But that is not the case. The Local Delegations are the sole bodies charged with beginning the local legislating process. If a delegation does not propose a desired local law, the Legislature will never enact it.

The Court explained that the water district in *Ball* 'did not exercise the sort of governmental powers that invoke the strict demands of *Reynolds*.' And the Court reasoned, in the alternative, that, ... 'as in *Salyer*, the nominal public character of the entity could not transform it into the type of governmental body for which the Fourteenth Amendment demands a one-person, one-vote system of election.' "

*Ante*, at 1310 (punctuation and citations omitted). In *Ball*, like the earlier special-purpose cases, while the Supreme Court *did* address the governmental body's functions, it did so for the purpose of explaining why it was reasonable and thus constitutional for the weight of voters' votes to differ. As I described earlier in my discussion of *Ball* and the other special-purpose cases, the central issue is still voters and whether their votes are equal, and, if not, whether that inequality is rationally justified. The critical determination in *Ball* was not just that the body exercised functions that were, in certain respects, more limited than other bodies, but rather that, those narrow functions had a disproportionate effect. *See Ball*, 451 U.S. at 362, 101 S.Ct. 1811 ("[T]he question in this case [is] whether the purpose of the [body] is sufficiently specialized and narrow *and* whether its activities bear on landowners so disproportionately as to distinguish [it] from those public entities whose more general governmental functions demand application of the *Reynolds* principle.") (emphasis added); *see also id.* at 377, 101 S.Ct. 1811 (White, J., dissenting) ("[T]he relevant constitutional inquiry [is whether the body has a] 'special limited purpose *and* [ ] disproportionate effect.' ") (emphasis in original). *Ball* did not create some sort of freestanding and freewheeling "governmental functions" limitation divorced from the reason for which those functions are relevant. Such a restricted view of the

reach of the one-person, one-vote rule is, as I have already explained, wholly inconsistent with the Supreme Court's jurisprudence.

Indeed, the Local Delegations scheme before this court does the precise opposite of that which the special-purpose cases like *Ball* allow: In special-purpose cases, the State affords unequal voting power because doing so allows people uniquely affected by government operations to have greater influence over those operations; but, here, Alabama has taken a class of citizens uniquely affected by a governmental body's operations (the residents of a particular county with respect to their county's Local Delegation) and has, through extending the franchise to entirely disinterested citizens (those in other, sometimes far away, counties), diluted their influence such that it is lesser than it otherwise would be. In other words, the majority's reasoning imposes an exception to the one-person, one-vote rule's application to geographically elected bodies that is precisely the opposite of the single exception the Supreme Court has recognized.

While purporting to rely on *Ball* and other cases, the majority states conclusorily that the limited legislative functions of Alabama's Local Delegations are not "the kind of governmental functions" that invoke the one-person, one-vote rule, *ante*, at 1309, but the majority offers entirely no principled basis for determining what "kind" of functions are the right kind. Instead of offering a principle of some sort that can be applied in later cases, the majority rattles off a series of good and bad functions with no apparent unifying principles at play: for unexplained reasons, "administer[ing] a school system," "provid[ing][ ] police, fire, [and other services]," and "impos[ing] ad valorem property taxes or sales taxes," are all the right kind, but "provi[ding] [ ] electricity" is the

wrong kind. *Ante,* at 1310–11. For reasons I am at a loss at understanding, the majority seems to think that Alabama's Local Delegations' county-law-gatekeeping function is more akin to that wrong kind of function than it is to the right kinds of functions. The majority's inability to articulate any sort of principled basis for its reasoning is unsurprising since, as the Supreme Court has said, "judicially manageable standards" for "distinguishing between [the purposes of] various elections" are not "readily perceiv[able]." *Hadley,* 397 U.S. at 55, 90 S.Ct. 791; *see also id.* (refusing to distinguish between "legislative" and "administrative" functions because requiring lower courts to do so "would leave courts with an equally unmanageable principle since governmental activities cannot easily be classified in the neat categories favored by civics texts") (punctuation and citation omitted). To the extent that the majority seems to think that it has found such a judicially manageable standard in this regard, it should say what it is.

And furthermore, the majority's reasoning that Local Delegations "exercise no general regulatory powers over counties," *ante,* at 1311, overlooks the numerous statutes allowing Local Delegations to appoint the officials who do. If "administer[ing] a school system" is the right kind of function, as the majority says it is, *ante,* at 1310, it is relevant that the Franklin County Local Delegation appoints an official to the board of education that does just that. *See* 1975 Ala.Code. § 45–30–101.01. If "impos[ing] ad valorem property taxes or sales taxes" is the right kind of function, *ante,* at 1310, it is relevant that the Etowah County Local Delegation appoints the members of an agency that "receive[s] and administer[s] [certain] tax proceeds" and "issue[s] bonds, secure[s] financing, and retire[s] debt." *See* 1975 Ala.Code. § 45–28–244.01(d). If "the power to administer

sanitation [and] health [ ] services" is the right kind of function, *ante,* at 1310, it is relevant that the Calhoun County Local Delegation appoints members of the water and sewer board. *See* 1975 Ala.Code. § 45–8A–24; Ala. Const. amend. 677. The list goes on.

Next, the majority turns to a series of state court and lower federal court opinions that it contends "have concluded that state and local government officials do not exercise government functions of the sort that trigger the requirement of one person, one vote for their elections when the officials only recommend action to voters or to another governmental body that is apportioned in compliance with the requirement of one person, one vote." *Ante,* at 1311. But those decisions do not lend the majority the support it believes.

For one, the majority cites a Second Circuit Court of Appeals decision, *Kessler v. Grand Cent. Dist. Mgmt. Ass'n,* 158 F.3d 92 (2d Cir.1998). This case, however, applies the special-purpose exception. Thus, for the same reasons already explained, *Kessler,* like *Ball* and the other special-purpose cases, does not support the majority's reasoning; it highlights its wrongfulness. Moreover, the *Kessler* court even cited approvingly the Second Circuit's earlier *Baker* decision, a case rejecting expressly the reasoning the majority adopts today. *See Kessler,* 158 F.3d at 103 (citing *Baker,* 520 F.2d at 802, and stating that, there, the circuit court "concluded that [the one-person, one-vote] rule applied to elections for a regional school board that had 'the exclusive power to initiate and propose' expenditures and borrowing"). Much like the governmental body the *Baker* court decided was subject to one-person, one-vote, Alabama's Local Delegations have the "exclusive power to initiate and propose" certain governmental action (in *Baker,* borrowing money, here,

enacting local laws). In sum, *Kessler* in no way supports the majority.[12]

Next, the majority points to *Polk Cnty. Bd. of Sup'rs v. Polk Commonwealth Charter Comm'n*, 522 N.W.2d 783 (Iowa 1994). What the majority does not say, however, is that that case, in adopting reasoning like the majority's, relied on the overturned Missouri state-court decision in *Quinn v. Millsap:* "Like the Board of Freeholders in [*Quinn v. Millsap* ], the Mayors' Commission does not exercise general governmental powers" because "its purpose is to collate information [and] mak[e] a recommendation to [another body]." *Polk Cnty. Bd. of Sup'rs*, 522 N.W.2d at 790. That case, in short, did nothing but perpetuate bad law that the majority seeks to revive, closing its eyes to the fact that the Supreme Court has already spoken.

Lastly, it must be conceded that the majority has indeed found two cases with reasoning similar to its own. In *Driskell v. Edwards*, 413 F.Supp. 974 (W.D.La.) (three-judge court), *aff'd mem.*, 425 U.S. 956, 96 S.Ct. 1735, 48 L.Ed.2d 201 (1976), the district court concluded that the make-up of Louisiana's state constitutional convention was not subject to one-person, one-vote, reasoning that, since the convention's proposed revised constitution would not be enacted until ratified by the voters, the rule did not apply. *See id.* at 977–78. For the reasons I have explained at length, I think that the district court's reasoning there, like the majority's today, is inconsistent with the present body of Supreme Court jurisprudence. Moreover, "sum-

mary affirmances have considerably less precedential value than an opinion on the merits.... [U]pon fuller consideration of an issue under plenary review, the Court has not hesitated to discard a rule which a line of summary affirmances may appear to have established." *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 180–81, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) (punctuation and citations omitted). And finally, the majority cites *McMillan v. Love*, 379 Md. 551, 842 A.2d 790 (Md.2004), which, in reasoning similarly to the majority, relied on the Eleventh Circuit Court of Appeals decision in *DeJulio v. Georgia*, 290 F.3d 1291 (11th Cir. 2002), the same decision from which this court draws its analysis and which I contend below is, like the majority's reasoning today, erroneous.

2.

The majority also faults the plaintiffs for "fail[ing] to identify the constitutional standard that we should employ to adjudicate [the] claim under the Equal Protection Clause." *Ante*, at 1304. The standard for adjudicating the one-person, one-vote rule is far from unresolved: "[E]very district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials." *Hadley*, 397 U.S. at 56, 90 S.Ct. 791.

Admittedly, Alabama may not be able to achieve one-person, one-vote equally for all Local Delegations while doing the same for both houses of the Legislature. (But then again it may. *See, e.g., Thigpen v. Meyers*,

---

12. As for the second opinion from the Second Circuit the majority cites, *Educ./Instruccion, Inc. v. Moore*, 503 F.2d 1187 (2d Cir.1974), there, the circuit's opinion is so terse, it is difficult to discern what were the functions of the governmental body at issue. But if I read the case properly, it seems that the body's sole duties were to propose non-binding rec-

ommendations wholly without legal effect, which is obviously distinguishable from Alabama's Local Delegations. *See supra,* note 11. In any event, both *Baker* and *Kessler* were decided after that case, so surely those decisions are better indicators of the circuit's current thinking.

231 F.Supp. 938, 941 (W.D.Wash.1964) (three-judge court) ("The weighting of a legislator's vote is but a form of reapportionment, and hence is within the equitable powers of this court, and such weighting gives constitutional validity to the statutes creating legislative districts which we have heretofore declared unconstitutional.") (citation omitted)). And I fully agree with the majority's criticism of the plaintiffs' suggestion that, "when a state enacts voting districts that elect members 'for both the state legislature and for local legislative delegations, ... the state can deviate from the principle of one-person, one-vote for the local delegations only to the extent that such deviations are necessary to comply with one-person, one-vote ... for the legislature as a whole.'" *Ante,* at 1304 (quoting Pls.' Br. (Doc. No. 106) at 1). Not only do I agree that the plaintiffs fail to define "necessary," I also cannot find anything in the law, constitutional or statutory, that says that achieving one-person, one-vote for Local Delegations should be subordinated to achieving one-person, one-vote for both houses of the Legislature or vice versa.

Instead, that the State is confronted with conflicting legal demands is not new. *Compare, e.g., Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) (the Voting Rights Act requires the State to, when redistricting, consider race and ensure minority voting strength to a certain extent), *with Miller v. Johnson,* 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (the State violates the equal protection clause where race is the "overriding and predominant force" in redistricting). What the State must do is resolve that conflict "as far as is practicable." *Hadley,* 397 U.S. at 56, 90 S.Ct. 791; *cf. id.* at 58, 90 S.Ct. 791 ("We have said before that mathematical exactitude is not required, but a plan that does not automatically discriminate in favor of certain districts is."). To the extent that the State falls short in one regard or in another regard or both, that failure, as long as rationally justified, does not violate the one-person, one-vote rule. What the State cannot do is to fail to recognize at all its one-person, one-vote obligations to the voters residing in the Local Delegations across the State.

3.

The majority's reasoning regarding "governmental functions" was drawn from an Eleventh Circuit Court of Appeals decision, *DeJulio v. Georgia,* 290 F.3d 1291 (11th Cir.), *cert. denied,* 537 U.S. 948, 123 S.Ct. 413, 154 L.Ed.2d 293 (2002). As explained by the majority, that case decided that Georgia's Local Delegations system, which, all parties in this case agree, functioned identically to Alabama's system in all material respects, was not subject to one-person, one-vote. Although the plaintiffs attempt to distinguish *DeJulio* on the basis of the remedy requested in that case, I agree with the majority that the distinction is without merit because both cases involved identical claims: one-person, one-vote challenges. Thus, although I think *DeJulio*'s reasoning, which the majority now adopts as its own, contravenes the law as explained by the Supreme Court, I nevertheless recognize that that decision is on point here.[13]

\* \* \*

**13.** There is a separate question as to whether this three-judge district court convened under 28 U.S.C. § 2284, for which appellate jurisdiction bypasses the Eleventh Circuit and proceeds directly to the Supreme Court, must apply the case law of the Eleventh Circuit.

*See Parker v. Ohio,* 263 F.Supp.2d 1100, 1112 n. 3 (S.D.Ohio 2003) (three-judge court) (Gwin, J., concurring); *Poe v. Werner,* 386 F.Supp. 1014, 1016–17 (M.D.Pa.1974) (three-judge court). Under the circumstances of this case, where no party has argued or briefed

Accordingly, I believe that this court should have reached the merits of the one-person, one-vote claim, and not merely as an alternative holding, and, based on my understanding of Supreme Court jurisprudence, the claim has merit. I respectfully dissent.

Now, only the Supreme Court can correct this injustice to thousands and thousands of citizens across all of Alabama whose votes are being inequitably and greatly discounted.

(or, as they conceded at oral argument, even researched) what I consider to be a very complicated issue; where the majority has decided that it will apply *DeJulio*'s reasoning regardless of whether it must; where a three-judge court from our own circuit has already stated that this circuit's law was binding on it, *Ala. NAACP State Conf. of Branches v. Wallace,* 269 F.Supp. 346, 350 (M.D.Ala.1967) (three-judge court); and where whether *DeJulio* is binding would not, as a practical matter, be determinative in the resolution of any appeal, I think it unnecessary for me to take issue with the majority's statement that *DeJulio* is binding precedent.